# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: July 30, 2026

| | | |
|---|---|---|
| BRIAN ANKLAM and KAREN ANKLAM, as the legal representatives of the estate of their daughter, N.A., deceased, | * | PUBLISHED |
| Petitioners, | * | No. 17-2061V |
| v. | * | Special Master Nora Beth Dorsey |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | Decision on Remand; Measles, Mumps, Rubella, Varicella ("MMRV") Vaccine; Seizure; Death. |
| Respondent. | * | |

Curtis R. Webb, Monmouth, OR, for Petitioners.
Katherine Carr Esposito, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON REMAND[1]

On December 29, 2017, Brian Anklam and Karen Anklam ("Petitioners"), as legal representatives of the estate of their daughter, N.A., deceased, filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2] Petitioners alleged that as a result of a Measles, Mumps,

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioners have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018) ("Vaccine Act" or "the Act"). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C.A. § 300aa.

Rubella, Varicella ("MMRV") vaccine N.A. received on June 23, 2016, N.A. developed a fever, which triggered a seizure that caused her death.[3] Petition at 2-3 (ECF No. 1). On November 29, 2023, the undersigned issued a Decision, finding Petitioners were not entitled to compensation and dismissing their petition. Anklam ex rel. N.A. v. Sec'y of Health & Hum. Servs., No. 17-2061V, 2023 WL 8890662 (Fed. Cl. Spec. Mstr. Nov. 29, 2023).

Petitioners filed a motion for review on December 29, 2023 followed by a motion for leave to file a newly published medical article from Gould et al.[4] ("Gould") on January 16, 2024. Both motions were denied, and Petitioners appealed. Opinion dated May 28, 2024 (ECF No. 110).[5]

On February 20, 2026, the Federal Circuit remanded this case "for the sole purpose of enabling the special master to consider the Gould article and whether the record should be reopened for further evidence."[6] Anklam ex rel. N.A. v. Sec'y of Health & Hum. Servs., No. 2024-2161, 2026 WL 480017, at *3 (Fed. Cir. Feb. 20, 2026).

This remains a tragic and heartbreaking case. The medical expert opinions and medical literature discussed herein suggest there are more questions than answers in cases of sudden death in children. The undersigned again extends her sympathy to Petitioners for their terrible loss and admires their participation in research and their journey to find answers. However, the undersigned again states that the Decision may not be based on sympathy but must be based on the evidence.

For the reasons described below, after reopening the record to consider Gould and the new evidence, the undersigned finds (1) Petitioners have not provided preponderant evidence that N.A. suffered a seizure prior to her death and (2) Petitioners have not provided preponderant evidence of a sound and reliable theory to explain how the MMRV vaccine can cause a seizure, which can lead to death.

---

[3] N.A. also received Haemophilus influenzae type B ("Hib"), pneumococcal conjugate ("Prevnar"), and Hepatitis A vaccines on June 23, 2016; however, Petitioners allege only the MMRV vaccine caused N.A.'s death. Petition at 2-3; Joint Prehearing Submission, filed June 3, 2022, at 4 (ECF No. 72).

[4] Laura Gould et al., Video Analyses of Sudden Unexplained Deaths in Toddlers, 102 Neurology 1 (2024). This was filed by both parties. See Petitioner's Exhibits ("Pet. Exs.") 82, 89; Respondent's ("Resp.") Ex. Z, Tab 1. The supplemental data was also filed. See Pet. Ex. 90.

[5] This was not made public.

[6] On April 24, 2026, Judge Bruggink issued an order vacating the judgment entered on May 29, 2024, reopening the case, and remanding the case to the undersigned for further proceedings consistent with the Federal Circuit's opinion. His order stated, "this case is reopened," and the undersigned has considered this order in her determination that reopening the case is warranted.

## I. REOPENING THE RECORD

The Federal Circuit and parties agree Vant Erve provides the appropriate standards for reopening the record. Anklam, 2026 WL 480017, at *2. The four relevant factors are (1) the nature of the proffered new evidence, (2) the prejudice to the parties, (3) the length of the delay, and (4) the reason for the delay.[7] Vant Erve v. Sec'y of Health & Hum. Servs., 39 Fed. Cl. 607, 612 (1997).

"[T]hese factors do not have equal weight, and the first factor is paramount." Anklam, 2026 WL 480017, at *2 (citing Vant Erve, 39 Fed. Cl. at 612). The Court in Vant Erve understood the first factor—"the nature of the proffered new evidence"—to mean "the extent to which the new evidence is both relevant and affective of outcome." Vant Erve, 39 Fed. Cl. at 612.

> In other words, if the evidence is of marginal relevance and impact, the burden on the moving party increases dramatically with respect to the influence of the remaining factors. . . . On the other hand, if the evidence is highly relevant and clearly outcome determinative, the opposite follows—the importance of the remaining factors diminishes.

Id.

The Federal Circuit in Anklam noted the relevant question before the undersigned "is whether the Gould article 'is relevant and affective of outcome.'" Anklam, 2026 WL 480017, at *2 (quoting Vant Erve, 39 Fed. Cl. at 612). The Circuit further opined the Gould article "*may* be relevant" to the undersigned's findings that Petitioner "failed to provide preponderant evidence of a sound and reliable theory to explain how the MMRV vaccine can cause a seizure . . . which can lead to death," yet the Gould article "is *less clearly* relevant" to the undersigned's finding that Petitioners "did not prove by preponderant evidence that N.A. suffered a seizure prior to her death." Id. at *3 (emphasis added).

The Circuit opined "the special master should have the opportunity in the first instance to consider whether the record should be reopened and exercise its discretion in light of the Gould article." Anklam, 2026 WL 480017, at *3. The Circuit further noted, "posing the question whether to reopen the record to the special master best reflects the statutory purpose of the Office of Special Masters in the unusual circumstances of this case, including the complexity of this case, the evidence supporting petitioners' position, and the special master's unique knowledge of the facts." Id.

The nature of the newly proffered evidence is a medical study (Gould) published in 2024 by the Sudden Unexplained Death in Childhood ("SUDC") Working Group to describe an evaluation of home video recordings related to seven cases of childhood death. The authors concluded that "[c]onvulsive seizures may be related to most sudden unexplained deaths in

---

[7] The Federal Circuit concluded "[P]etitioners have satisfied factors 3 and 4 of Vant Erve," and thus, those factors will not be discussed. Anklam, 2026 WL 480017, at *2.

young children." Pet. Ex. 82 at 6. They stated that "[t]hese recordings of sudden childhood deaths are a unique data set providing compelling evidence that terminal seizures may be much more common than medical histories suggest." Id. at 7. The study addresses issues which may be relevant to causation here.

Given the Federal Circuit's acknowledgement of the statutory purpose of the Vaccine Act, the role of special masters, as well as the complexity of the medical issues involved, the undersigned finds it appropriate and reasonable to reopen the record to consider the Gould article. See Anklam, 2026 WL 480017, at *2-3. Due to the complex medical issues presented in Gould, the question of whether the study is relevant and affective of the outcome cannot be determined without the opinions of specialized medical experts. After discussion with the parties, it was agreed that the case should be reopened for consideration of the new evidence. Order dated May 6, 2026 (ECF No. 118). The parties further agreed it was reasonable and appropriate for the parties to file expert reports for the narrow purpose of providing an analysis of Gould, as well as opinions related to facts and causation based on analysis of the new evidence. Id.; Joint Status Report, filed May 12, 2026 (ECF No. 119).

Toward that end, the parties filed expert reports addressing Gould and the issues identified by the Federal Circuit: (1) whether Petitioners provided preponderant evidence that N.A. suffered a seizure prior to her death (factual dispute and pertains to Althen prong two) and (2) whether Petitioners provided preponderant evidence of a sound and reliable theory to explain how the MMRV vaccine can cause a seizure which can lead to death (Althen prong one). Anklam, 2026 WL 480017, at *2-3. Althen prong three, regarding the question of a temporal association, is not addressed because the parties previously stipulated there was a temporal association and that element of causation is not in dispute. Anklam, 2023 WL 8890662, at *43.

The parties, per agreement, filed simultaneous expert reports on July 9, 2026. See Joint Status Report, filed May 12, 2026 (ECF No. 119). The matter is now ripe for adjudication.

## II. BACKGROUND

### A. Factual History[8]

#### 1. Stipulated Facts

The parties agreed to the following stipulated facts as set forth in their Joint Prehearing Submission. See Joint Prehearing Submission at 1-4.

N.A. was born on June 18, 2015 in Saginaw, Michigan. Pet. Ex. 2 at 3. She was noted to be doing well with appropriate growth and development at her one-year well-child visit on June 23, 2016. Pet. Ex. 4 at 33. N.A. received Hib, Prevnar, Hepatitis A, and MMRV vaccinations on June 23, 2016 at the office of her pediatrician in Croswell, Michigan. Pet. Ex. 4 at 34.

[8] This section on factual history was taken from the undersigned's Decision. Anklam, 2023 WL 8890662, at *3-9.

N.A.'s parents took N.A. and her three siblings to a splash park for about two hours during the afternoon of June 30, 2016. Pet. Ex. 1 at 2; Pet. Ex. 5 at 5. N.A.'s mother thought that N.A. had developed a fever at about 6:00 p.m. on the evening of June 30, 2016. Pet. Ex. 1 at 3; Pet. Ex. 5 at 5. N.A.'s mother gave N.A. a 3.75 ml dose of Motrin and a tepid bath at about 6:00 p.m. Pet. Ex. 1 at 3; Pet. Ex. 5 at 5. N.A.'s mother put N.A. in her crib for the night at between 6:30 p.m. and 7:00 p.m. on June 30, 2016. Pet. Ex. 1 at 3; Pet. Ex. 5 at 5.

N.A. was found dead, face down in her crib, by her father, at about 9:00 a.m. on July 1, 2016. Pet. Ex. 1 at 3; Pet. Ex. 5 at 2, 5; Pet. Ex. 6 at 1. He reported that he first saw N.A.'s feet sticking out of the crib slats. Pet. Ex. 1 at 3; Pet. Ex. 5 at 3. He said that N.A.'s feet were purple, her arms were straight out with her elbows at her sides (like a star), and her face was straight down to the mattress. Pet. Ex. 1 at 3; Pet. Ex. 5 at 3-5. He did not see anything coming out of N.A.'s mouth. Pet. Ex. 1 at 3.

N.A.'s father is an experienced paramedic. He immediately knew that N.A. was dead and had died some time before. Pet. Ex. 1 at 3; Pet. Ex. 5 at 5.

An autopsy of N.A. was done on July 3, 2016. Dr. Kanu Virani, M.D., the Forensic Pathologist who performed the autopsy, opined

> [N.A.] died of asphyxia. She was found dead face down in a crib. The entire autopsy failed to identify any natural disease. Children at age of one year and older should be able to turn side way or face up at the time of possible breathing difficulties during sleep. The entire autopsy and investigation surrounding her death[] failed to identify [a] possible factor for asphyxia. There are no physical injuries. The manner of death is undeterminable.

Pet. Ex. 6 at 1.

Other potentially relevant notations in the autopsy report include Dr. Virani's observations of a "[s]mall amount of mucus [] present in nostrils," that the "[t]he respiratory mucosa [was] mildly congested," a "[s]mall amount of mucus [] present in the trachea and bronchi," and that "[t]here [was] no laryngeal edema or upper airway obstruction." Pet. Ex. 6 at 2-3. Microscopic examination of the lungs showed congested septa and minimal chronic inflammation of the submucosa of the epiglottis. Id. at 4.

N.A.'s twin sister, L.A., slept in a separate crib in the same room as her sister. She also received an MMRV vaccination on June 23, 2016. During the evening of July 1, 2016, Mrs. Anklam noted that L.A. had a rash on her back and felt a little warm. She had an elevated temperature, less than 100°F. Pet. Ex. 1 at 4. Petitioners brought L.A. to the emergency room ("ER") at the local hospital on July 1, 2016. She had a temperature of 100.2°F (rectal) at the hospital.[9] Pet. Ex. 1 at 4; Pet. Ex. 7 at 3.

[9] L.A. was examined and otherwise discharged from the hospital. See Pet. Ex. 7.

N.A.'s older brother, L.B.A. (DOB: 04/25/2012), experienced febrile seizures on March 16, 2015, and August 28, 2016, and was seen in the hospital on July 17, 2016, for fever, vomiting, and being "somewhat dazed and not acting quite right." Pet. Ex. 1 at 4; Pet. Ex. 7 at 4-6, 9-14, 24-27.

### 2. Summary of Medical Records

In addition to the facts stipulated to by the parties, the following summary of facts provides additional relevant information.

N.A. was born on June 18, 2015, along with her twin sister, L.A., without complications. Pet. Ex. 2 at 3. N.A. had a heart murmur that was resolved by discharge on June 21, 2015. Pet. Ex. 3 at 6-8; Pet. Ex. 4 at 2. At discharge, N.A. had a normal examination and appeared healthy. Pet. Ex. 3 at 6-8.

N.A. visited her pediatrician, Dr. Matthew Gormley, regularly for well-child visits from June 2015 to March 2016. Pet. Ex. 4 at 2-17, 20-27. N.A. was noted to be doing well and had appropriate growth and development. Id. at 3, 7, 12, 15-16, 21-22, 26. At visits in September 2015 and November 2015, N.A. received Pediatrix (diphtheria-tetanus-acellular pertussis ("DTaP"), hepatitis B, and Polio), Hib, Rotarix (Rotavirus), and Prevnar vaccinations. Id. at 12, 16. N.A. received the third doses of Pediatrix and Prevnar at a visit in December 2015. Id. at 22. No adverse reactions were noted following these vaccinations. See id. at 12, 16, 22.

On November 23, 2015, N.A. presented to Dr. Gormley with "nasal congestion and cough/wheezing for the last [three] weeks." Pet. Ex. 4 at 18. She had no fever or chills. Id. Assessment was an upper respiratory infection. Id. Dr. Gormley noted it was likely a viral illness and recommended follow-up if no improvement. Id.

N.A. presented to Dr. Gormley's office on May 13, 2016. Pet. Ex. 4 at 28. N.A. had some congestion, slight swelling near the right eye, and some eye drainage the day prior. Id. By that morning, the right eye was red and swollen shut. Id. No fever was noted. Id. Assessment was cellulitis. Id. N.A. was prescribed Cephalexin and was directed to return in one week. Id.

On May 18, 2015, N.A. returned for a follow-up examination. Pet. Ex. 4 at 30. N.A.'s father reported her "eye [was] no longer red or swollen and [there was] no further drainage." Id. N.A. was tolerating the antibiotics well. Id. Physical examination was normal. Id. N.A. was noted to have a body mass index in the "5th percentile to less than 85th percentile for age." Id. Notes indicated N.A.'s cellulitis was "resolved." Id. N.A.'s parents were instructed to continue giving her Cephalexin twice daily. Id.

N.A. presented to Dr. Gormley for her one-year well-child visit on June 23, 2016. Pet. Ex. 4 at 32. She was not currently on any medications. Id. N.A. did not have a fever, cough, or breathing issues. Id. Physical examination was normal. Id. at 33. Dr. Gormley noted N.A. was "[d]oing well" and had "appropriate growth and development." Id. At this visit, N.A. received her third Hib, fourth Prevnar, first hepatitis A, and first MMRV vaccinations. Id. at 34. No adverse reactions were noted. See id. at 32-35.

On the morning of July 1, 2016, shortly after 9:00 a.m., N.A. was found unresponsive in her crib. Pet. Ex. 5 at 3. N.A. "had obvious rigor mortis and was cold to the touch." Id. at 3. She "also had pooling on her skin that indicated that she had been deceased for some time." Id. Time of death was placed between 9:00 p.m. and 10:00 p.m. on June 30, 2016. Id. at 6.

### 3. Sheriff's Records

The Sheriff's records indicated Officer Robby Joe Wendling arrived on scene at approximately 9:35 a.m. on July 1, 2016. Pet. Ex. 5 at 3. He entered N.A.'s room and noted she was face up, "had obvious rigor mortis[,] and was cold to the touch." Id. She "also had pooling on her skin that indicated that she had been deceased for some time." Id.

Detective Mark Ruggles and Sergeant Shelly Park arrived on the scene shortly thereafter. Pet. Ex. 5 at 4. Detective Ruggles noted rigor mortis was fixed, livor mortis was consistent with Mr. Anklam's description that N.A. was found face down in a blanket, and N.A. was cold to the touch. Id. Detective Ruggles examined N.A. and found no injuries. Id.

The Incident Report documented that Petitioners took their children, including N.A., to the Splash Pond until 5:15 p.m. on June 30, 2016. Pet. Ex. 5 at 5. Once the family arrived home, the children were fed chicken noodle soup for dinner and then given a bath. Id. Mrs. Anklam stated N.A. was running a low-grade fever and given Motrin around 6:00 p.m. Id. Around 6:30 p.m., the children were put to bed. Id. Petitioners reported they did not hear anything from L.A. and N.A.'s room during the night. Id.

Mrs. Anklam stated she woke up around 6:30 a.m. and did not check on N.A. prior to leaving for work. Pet. Ex. 5 at 5. Mr. Anklam stated he went into L.A. and N.A.'s room around 9:00 a.m., when he found L.A. awake. Id. While changing L.A.'s diaper, he noticed N.A.'s "feet were just outside the rails of the crib." Id. He noticed "some discoloring to [N.A.'s] feet" and felt they were cold. Id. He turned her over and saw "she was 'pooling.'" Id. "[Mr. Anklam] stated that he knew right away that she was dead." Id.

Petitioners reported that N.A. "ha[d] been running a low grade fever, sometimes up to 100.5 since [June 19, 2016]." Pet. Ex. 5 at 5. The fever would fluctuate and sometimes dissipate. Id. Other than that, N.A.'s only other issue since birth was right eye swelling in May 2016. Id.

Time of death was placed between 9:00 p.m. and 10:00 p.m. on June 30, 2016. Pet. Ex. 5 at 6.

### 4. Autopsy[10]

An autopsy was conducted by Dr. Virani on July 3, 2016. Pet. Ex. 6 at 1. Autopsy findings indicated asphyxia with pulmonary edema and blanching on face. Id. Dr. Virani opined

[10] For additional facts and findings found during the autopsy, see Pet. Ex. 6.

> [N.A.] died of asphyxia. She was found dead face down in a crib. The entire autopsy failed to identify any natural disease. Children at age of one year and older should be able to turn side way or face up at the time of possible breathing difficulties during sleep. The entire autopsy and investigation surrounding her death[] failed to identify [a] possible factor for asphyxia. There are no physical injuries. The manner of death is undeterminable.

Id.

External examination noted "[b]lanching . . . in central portion of the face" and "[s]mall amount of mucus present in nostrils." Pet. Ex. 6 at 2. Internal examination revealed the "hippocampi [were] without abnormality." Id. There was no abnormality of the head or brain. Id. "There [was] no laryngeal edema or upper airway obstruction." Id. at 3. Examination of the respiratory system revealed "[p]ulmonary edema and congestion," "[s]mall amount of mucus . . . in trachea and bronchi," and "mildly congested" respiratory mucosa. Id.

Microscopic examination of the lungs revealed "edema fluid and scatter macrophages[[11]] in alveoli,"[12] congested septa,[13] and "[m]inimal chronic inflammation . . . in the submucosa of epiglottis." Pet. Ex. 6 at 4. There was no acute or chronic inflammation in the trachea or

[11] A macrophage is a "form[] of mononuclear phagocytes found in tissues" that "arise from hematopoietic stem cells in the bone marrow." Macrophage, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=29296 (last visited July 20, 2026). Macrophages engage in "[p]hagocytic activity" and are also "involved in cell-mediated immune responses." Stedman's Medical Dictionary 1141 (28th ed. 2006). Phagocytosis is the process by which "particulate material, such as microorganisms or cell fragments[,] . . . is taken into the cell in membrane-bound vesicles (phagosomes) that originate as pinched-off invaginations of the plasma membrane. Phagosomes fuse with lysosomes, forming phagolysosomes in which the engulfed material is killed and digested." Phagocytosis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=38307 (last visited July 20, 2026).

[12] An alveolar macrophage is "a rounded granular type, found within the alveoli of the lungs and serv[es] to ingest inhaled particulate matter." Alveolar Macrophage, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=87677 (last visited July 20, 2026). Alveolus is "a small saclike structure" found in the lungs. Alveolus, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=2006 (last visited July 20, 2026).

[13] Septum is "a dividing wall or partition." Septum, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=45434 (last visited July 20, 2026). Septa can "separate adjacent pulmonary alveoli, containing connective tissue constituents of the respiratory tissue and the capillary network of the blood supply of the lung." Interalveolar Septum, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=105585 (last visited July 20, 2026).

bronchi and no evidence of aspirated foreign material and inflammation in airways or alveoli. Id.

Dr. Virani examined sections of the brain and did not find any abnormality. Pet. Ex. 6 at 4. He also reviewed "[s]ections of brain, heart, liver, spleen, thymus, kidneys, thyroid, adrenals, pituitary, stomach, intestines, appendix, pancreas, lymph nodes, bone marrow[,] and urinary bladder" and reported that they were all "unremarkable." Id. Additionally, toxicology testing did not reveal any positive findings. Id. at 5-6.

Dr. Virani documented the date of death to be "June 30, 2016, unknown PM." Pet. Ex. 6 at 1.

#### 5. SUDC Registry and Research Collaborative ("SUDCRRC")[14] Case Review Report

Petitioners participated in the SUDCRRC, consenting to have N.A.'s case reviewed. This collaborative "analyzes cases of sudden unexpected deaths in children to understand risk factors and causes and to develop preventative measures by studying available records . . . and performing genetic analyses and special studies." Pet. Ex. 77 at 3.

As part of the case review, N.A.'s parents were interviewed. In the interview on September 1, 2016, N.A.'s parents (Petitioners) reported no concerns about N.A.'s development. Pet. Ex. 77 at 5. During her life, N.A. had "no known seizures." Id. During the last 48 hours of her life, N.A. was "[c]ongested occasionally, but otherwise fine." Id. In her last 24 hours, N.A. "had a minor cold and [] appeared 'worn out, but not lethargic.'" Id. She also had a low-grade fever. Id. She was given one dose of Motrin after her dinner at 6:00 p.m. Id. at 5, 8.

Autopsy tissue of the brain (3 slides) was reviewed by the SUDCRRC neuropathologist who found no significant histopathology. Pet. Ex. 77 at 8. Further, "[t]he SUDCRRC Forensic Pathology reviewers were in complete agreement with the reviews of the study's . . . neuropathologist." Id. Based on their review, the "forensic pathologist consider[ed] the significant findings . . . to be: 1) [s]ibling with genetic syndrome associated with slightly prolonged QT,[15] 2) [s]ibling with febrile seizures, 3) [f]ound prone with face pressed into mattress with blanching lividity on face." Id. at 8-9. Under cause of death, the report concluded

---

[14] SUDCRRC was established in 2014 and is approved by the New York University Langone Health Institutional Review Board. Pet. Ex. 82 at 2. It "includes parental written consent [] of those enrolled, as well as consent for publication of the data presented in [the] video series" reported in Gould. Id.

[15] "A prolonged QT interval is an irregular heart rhythm. It is a change in how the heart's bottom chambers send signals. In a prolonged QT interval, it takes longer than usual for the heart to recharge between beats. A prolonged QT interval can be seen on a heart test called an electrocardiogram." Prolonged QT Interval, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/long-qt-syndrome/multimedia/prolonged-q-t-interval/img-20007972 (last visited July 20, 2026).

N.A.'s death was an "[u]nexplained sudden death," with intrinsic factors including "[f]ebrile at time of death and evidence of immune activation" and extrinsic factors including "[f]ound prone with face down with blanching." Id. at 9. The manner of death was "[u]ndetermined." Id. The report was signed by Dr. Orrin Devinsky, Principle Investigator. Id. at 10.

A SUDCRRC genetic panel was also performed for N.A. and "[n]o clinically significant variants [were] identified." Pet. Ex. 80 at 2.

### 6. Mrs. Anklam's Affidavit & Hearing Testimony

Mrs. Anklam is N.A.'s mother. Transcript ("Tr.") 6; Pet. Ex. 1 at ¶ 1. She works as a nurse anesthetist, and her husband, Mr. Anklam, is a paramedic. Tr. 225; Pet. Ex. 1 at ¶¶ 19, 33.

N.A. was born on June 18, 2015. Pet. Ex. 1 at ¶ 2. She had a heart murmur that resolved prior to discharge. Id. "[N.A.] was healthy and developing normally until her sudden death on June 30, 2016." Id. at ¶ 3. Her "development was normal" and she was "always fed well." Id. at ¶¶ 4-5.

On June 23, 2016, N.A. received her third Hib, fourth Prevnar, first hepatitis A, and first MMRV vaccinations at the office of her pediatrician, Dr. Gromley. Pet. Ex. 1 at ¶ 6. Although she cried after receiving the vaccinations, her "behavior was pretty normal." Id. at ¶¶ 7-8. For the first two days following the vaccinations, Mrs. Anklam gave N.A. Motrin. Id. at ¶ 8. Because she was getting her first molars, "she was a little more cranky and drooling more than usual." Id. "[N.A's] behavior was unremarkable from June 23 to June 29." Id. at ¶ 9.

On the morning of June 30, 2016, N.A. was well. Tr. 6. That afternoon, around 3:00 p.m., Petitioners took their children, including N.A., to a splash park. Tr. 6-7; Pet. Ex. 1 at ¶ 10. "[N.A.] was a bit crankier than usual, but it was a warm day, and [Mrs. Anklam] attributed it to that." Pet. Ex. 1 at ¶ 10. They arrived home around 5:00 p.m. and had chicken noodle soup for dinner, which ended sometime between 5:30 p.m. and 5:45 p.m. Tr. 7, 14; Pet. Ex. 1 at ¶ 11. "N.A. was very sleepy." Tr. 8; see also Pet. Ex. 1 at ¶ 11.

Following dinner, both N.A. and her twin sister, L.A., felt warm. Tr. 8; Pet. Ex. 1 at ¶ 12. Because of her experience as a mother and a nurse, Mrs. Anklam did not take their temperatures. Tr. 8; Pet. Ex. 1 at ¶ 13. She bathed both N.A. and L.A. together and noted they were both fine at the time. Tr. 9. Following the bath, Mrs. Anklam gave both N.A. and L.A. Motrin around 6:30 p.m., before putting them to bed in the same room in separate cribs sometime between 7:00 p.m. and 7:30 p.m. Tr. 9-10, 14; Pet. Ex. 1 at ¶ 14.

During the night, Petitioners did not hear anything from N.A.'s room. Pet. Ex. 1 at ¶ 15. In her affidavit, Ms. Anklam noted that there was an audio-video and temperature monitor in N.A.'s room, but that Petitioners "[did not] hear anything that night." Id. N.A. and L.A. had been sleeping longer, and Petitioners attributed it to a growth spurt. Id. at ¶ 16.

The following morning, July 1, 2016, Mrs. Anklam left home at 6:30 a.m. to go to work. Tr. 10. She did not check on N.A. and L.A. prior to leaving for work. Tr. 10-11. Mr. Anklam

went into N.A. and L.A.'s room around 9:00 a.m. that morning. Pet. Ex. 1 at ¶ 17. "When he glanced at [N.A.'s] crib, he knew something was wrong. Her feet were sticking out of the crib slats and her arms were straight at the elbows and out to her sides (like a little star)." Id. at ¶ 18. He saw N.A.'s feet were purple, she was face down, and "[t]here was nothing coming out of her mouth." Id. at ¶ 19. "He picked [N.A.] up and knew she was dead and had been for a while." Id. at ¶ 20. He then called 911 and Mrs. Anklam. Id.

Mrs. Anklam testified that she never saw N.A. have a seizure or knew her to have a fever in excess of 100°F. Tr. 15.

Mrs. Anklam testified the none of the three other children were ill on June 30, 2016, or showed symptoms of infection on July 1, 2016. Tr. 12. However, during the evening of July 1, 2016, around 7:00 p.m., Petitioners took N.A.'s twin sister L.A. to the ER because she had a slightly elevated fever and a rash on her back. Tr. 11; Pet. Ex. 1 at ¶¶ 21, 24. Mrs. Anklam averred that she was terrified to put her to bed because Petitioners did not know what led to N.A.'s death. Pet. Ex. 1 at ¶¶ 21-22. A thorough work up was completed and L.A. was discharged shortly after 9:00 p.m. Id. at ¶ 24.

After N.A. passed, Petitioners enrolled their family in a study of SUDC. Pet. Ex. 1 at ¶ 26. "Throughout [their] participation in that study []and [Mrs. Anklam's] own efforts to understand [N.A.'s] death[], [she] [] learned medical literature links [SUDC] to unobserved febrile seizures," which she averred "seem[s] especially relevant to [N.A.'s] death because MMRV vaccinations cause fevers and febrile seizures in the second week after vaccinations." Id. at ¶¶ 27-28.

Additionally, Mrs. Anklam explained that one of her sons had suffered three febrile seizures, and "[she] learned that children who die unexpectedly often have a history of febrile seizures or a family history of febrile seizures." Pet. Ex. 1 at ¶¶ 28, 41. His first seizure occurred on March 16, 2015. Id. at ¶ 30; Tr. 14-15, 224. On that day, he complained of ear pain and he had a "high normal" temperature below 100°F. Tr. 224; Pet. Ex. 1 at ¶ 30. He was given Motrin. Tr. 224; Pet. Ex. 1 at ¶ 30. While at the park over one hour later, he began seizing. Tr. 224-25; Pet. Ex. 1 at ¶¶ 31-32. When they arrived at the ER, his temperature was between 103°F and 104°F. Tr. 225; Pet. Ex. 1 at ¶ 35. He had two subsequent febrile seizures in July and August 2016. Pet. Ex. 1 at ¶¶ 36-40. He had genetic testing done that showed he had a 3q26 microdeletion, which Mrs. Anklam testified is not associated with seizures. Tr. 16, 223. Additionally, following N.A.'s passing, the other three children received cardiac evaluations, and all three were cleared. Tr. 15.

### B. The Gould Study

Gould was published in 2024 by the SUDC Video Working Group to describe an evaluation of home video recordings related to seven cases of childhood death from the Registry[16] of 301 sudden unexplained deaths. Pet. Ex. 82 at 1. The videos were assessed by eight independent physicians for "video quality, movement, and sound." Id. The seven cases

[16] The Registry is also SUDCRRC. See Pet. Ex. 82 at 2; see also supra note 14.

included four boys and three girls, ages 13 to 27 months, who had videos of their terminal sleep period. Id. Five recording were continuous and two were discontinuous, "triggered by sound or motion." Id. All five continuous recordings showed a "terminal convulsive event lasting 8-50 seconds," and four of these children "survived for >2.5 minutes postconvulsion." Id. Of the two discontinuous recordings, one "suggested a convulsive event." Id. Six children were "prone with face down," and one had "autopsy evidence of airway obstruction." Id. None of the children had evidence of a cardiac arrhythmia, all of the children had normal cardiac pathology tissue, and genetic testing (whole-exome sequencing) did not identify "cardiac disease variants." Id. The authors concluded that "[c]onvulsive seizures may be related to most sudden unexplained deaths in young children." Id. at 6. "[T]hese recordings of sudden childhood deaths are a unique data set providing compelling evidence that terminal seizures may be much more common than medical histories suggest." Id. at 7. However, Gould concluded that "[t]he causes of the convulsive events in our cases are unknown; mild infections may have lowered the seizure or febrile seizure threshold." Id.

All seven cases were "sleep-related," with six occurring during nocturnal sleep and one occurring during daytime naptime. Pet. Ex. 82 at 5. Four of the children had "disorders" during the last 72 hours prior to death, and these included cold symptoms, cough, fever, diaper rash, and teething. Id. All of seven children were found "prone with face down into bedding," except for one who had a face to the side position. Id. Genetic whole-exome sequencing did not identify any relevant variants in any case. Id. Six of the children had "postmortem evidence of infection with mild pathology not considered significant for primary cause of death." Id. Three children had "hippocampal dentate gyrus changes," however, none of these children had a history of febrile seizures. Id. The one child with a history of febrile seizure had normal hippocampi when examined microscopically. Id. at 4, tbl.2, 5.

Gould reported that in the Registry of 248 children who died before 60 months, "29.4% had febrile seizures, consistent with previous studies implicating febrile seizures in some of these deaths." Pet. Ex. 82 at 3 tbl. 1, 6. In this same group of younger children, 116 (46.8%) had cold symptoms and/or fever in the 48 hours preceding death, 194 (83.1%) were found with the body in the prone position, and 125 (54.1%) were found with their face prone. Id. at 3, tbl. 1, 5.

Regarding limitations of the study, the authors noted that the study was limited by the sample size and lack of contemporaneous physiologic monitoring. Pet. Ex. 82 at 7. Regardless of these limitations, they suggested that "terminal seizures may be more common than medical histories suggest." Id. They concluded that "[t]erminal seizures may play a role in many unwitnessed sleep-related deaths" in children. Id.

Gould did not discuss vaccinations. See Pet. Ex. 82.

### C. Expert Reports on Remand[17]

#### 1. Petitioners' Expert, Dr. Robert M. Shuman, M.D.[18]

##### a. Analysis of Gould[19]

Dr. Shuman presented an overview of Gould along with a summary of definitions, circumstances of sudden death, and methodology. He explained that toddlers (age 12 months to 60 months of age) were studied because most SUDC cases occur in this age group.[20] Pet. Ex. 83 at 3. The circumstances of sudden unexplained death in this age group arises when there are "no unusual signals of distress or illness." Id. Crying, discomfort, or whining as the toddler is put to bed is "within the child's usual behavior." Id. Any signs or symptoms of illness "must be trivial," such as "warm to touch" or a temperature less than 101° Fahrenheit. Id. Excluded from the SUDC category are those deaths that occur after recovery from serious illness, such as "sepsis, abscess, meningitis, or pneumonia," or deaths that occur in children with chronic illnesses. Id. Further, to qualify as SUDC, there must be "a thorough and competent exploration of the cause of death" before it can be identified as "unexplained." Id. This evaluation includes a medical record review by a pediatrician and complete autopsy by a competent pathologist. Id.

---

[17] Summaries of the expert opinions of Dr. Marcel Kinsbourne, Dr. Douglas C. Miller, Dr. Christine McCusker, Dr. Sara O. Vargas, and Dr. Hart G.W. Lidov were provided in the undersigned's initial Decision and are not repeated here. See Anklam, 2023 WL 8890662, at *9-33.

[18] Petitioners' expert neurologist, Dr. Marcel Kinsbourne, passed during the pendency of this case. Dr. Shuman was retained by Petitioners following this remand. Dr. Shuman submitted one expert report. Pet. Ex. 83. Dr. Shuman received his M.D. from Stanford University School of Medicine in 1968, followed by a pediatrics internship, pediatrics residency, pathology residency, neuropathology fellowship, neurology residency, and epilepsy mini-fellowship. Pet. Ex. 84 at 2. He held various academic appointments from 1974 to 1991. Id. at 1-2. From 1991 to 2006, Dr. Shuman worked in private practice as a child neurologist. Id. at 2. It does not appear that he has worked with patients since 2006. See id. Dr. Shuman has authored or co-authored almost 100 publications over the course of his career. Id. at 7-13. He is board certified in neurology with a special competence in child neurology, neuropathology, and neuroimaging. Id. at 3.

[19] This summary does not include Dr. Shuman's discussion about a study of deaths in epileptics, where the deaths were erroneously recorded as cardiac deaths instead of seizure/epilepsy deaths. See Pet. Ex. 83 at 8-9 (citing Pet. Ex. 85). The undersigned does not discuss Dr. Shuman opinions related to this topic for the sake of brevity and relevance but acknowledges that the study shows that specialists in different fields may categorize deaths differently, and that seizure and epilepsy specialists may be "more willing to pronounce Epilepsy" due to medical history than other types of specialists or multi-disciplinarians. Id. at 9 (citing Pet. Ex. 85).

[20] For clarity, the authors evaluated seven videos of sudden deaths in toddlers, but their Registry included children aged one month through 18 years. Pet. Ex. 82 at 1-2.

Next, Dr. Shuman focused on the Gould finding of febrile seizures in 71 of the 248 toddlers (age ≤ 60 months) as compared to 4 of the 53 children in the older SUDC population (age > 60 months). Pet. Ex. 83 at 5; see Pet. Ex. 82 at 3 tbl. 1. He opined that children in the toddler group were four times more likely to have had febrile seizures and 10 times more likely to have a family history of febrile seizures than the older group of children. Pet. Ex. 83 at 5 (citing Pet. Ex. 82 at 3 tbl.1). Additionally, Dr. Shuman noted that the younger group were eight times more likely to have experienced a "cold and/or a fever" in the last two days of life than the older group. Id. (citing Pet. Ex. 82 at 3 tbl.1). He opined that these three factors (febrile seizures, family history of febrile seizures, and fever/cold) "are each significantly different" as compared to the older SUDC group. Id.

Turning to the videos, Dr. Shuman noted that none of the children had simultaneous EEG studies, that auditory recordings "were variable," and "physiologic monitors" were not constant. Pet. Ex. 83 at 5 (citing (citing Pet. Ex. 82 at 4 tbl. 2). One of the videos was not used due to the lack of video image of the child. Id. (citing Pet. Ex. 82 at 5). The remaining seven videos were independently reviewed by six pathologists, and consensus opinions were combined. Id. (citing Pet. Ex. 82 at 3). In case number five, death was determined to be "caused by Hemophilus influenza [("*Haemophilus influenzae* or *H. influenzae*")] sepsis [without] seizure" and was the only case of the seven where convulsions were not identified on video. Id. (citing Pet. Ex. 82 at 4 tbl. 2).

According to Dr. Shuman, the other six cases showed "visible pre-mortem seizures at the moments of death" which he deemed "highly statistically significant" because previously, the "incidence of recognizable stigmata of epilepsy, post-mortem, without animation, ha[d] been near zero." Pet. Ex. 83 at 6. He opined that death caused by seizures have been difficult to identify because there are no witnesses, no medical history, and no video record of death. Id. And therefore, Dr. Shuman asserted the Gould study changes this lack of documentation as "we now have evidence that a large proportion of SUDC in toddlers is caused by seizures (6/7!)." Id.

Using data from a textbook,[21] Dr. Shuman stated that the prevalence of epilepsy in children younger than age five (data from USA, Iceland, Sweden, Spain, and Estonia) is 2 to 4 per 1,000 population.[22] Pet. Ex. 83 at 6 (citing Pet. Ex. 86 at 6-7). He opined that the prevalence

[21] Epilepsy: A Comprehensive Textbook (Jerome Engel et al. eds., 2nd ed. 2008). Only four pages of a chapter were filed.

[22] The undersigned cannot confirm this statistic is accurate from the pages provided. Dr. Shuman's estimates appear incorrect as the figure provided suggests the prevalence in children under five years of age is 0 to 2 per 1,000. See Pet. Ex. 86 at 7 fig.9. Additionally, some of this data is from 1980 (USA) and the 1990s (Iceland and Sweden). Id.

of epilepsy increases linearly each year until age 15.[23] Id. Based on this data point, Dr. Shuman opined that "an incidence of [approximately] 1/1,000 [t]oddlers seems reasonable." Id. He opined that "[t]his concentration of death by seizure would be expected to occur rarely by chance," calculating that the odds would be "once in a billion [] times by chance." Id. Dr. Shuman concluded that the Gould videos prove that a terminal seizure in 6 out of 7 SUDC toddlers "is a highly significant statistical association." Id. Dr. Shuman cautioned against dismissing the significance of the Gould findings, giving examples including death caused by the Ebola virus and the probability based on a coin toss. Id. at 6-7.

Regarding the individual cases described by Gould, Dr. Shuman noted that cases 1, 2 and 4 had terminal seizures, and there was no personal or family history of seizures in these children. Pet. Ex. 83 at 7 (citing Pet. Ex. 82 at 4 tbl. 2). Dr. Shuman stated there was evidence of airway obstruction, but the evidence was "insufficient to explain death." Id. Cases 1 and 2 had evidence of mild infection, but the pathology results were not sufficient to establish infection as the primary cause of death. Id. These three children also had abnormalities of the hippocampal dentate gyrus[24] and were categorized as "SUDC, Terminal Seizures, Abnormal brain." Id. (emphasis omitted).

Case 3 had a terminal seizure with evidence of influenza A infection, but with mild pathology considered insufficient to be the primary cause of death. Pet. Ex. 83 at 7 (citing Pet. Ex. 82 at 4 tbl. 2). This child had a fraternal twin, had prior witnessed afebrile and febrile seizures, and a family history of febrile seizures. Id. Dr. Shuman stated that this child "probably sustained multifocal cerebral damage from his twin gestation and/or twin delivery. Twinning is infamous for its increased neurodevelopmental morbidity."[25] Id. Further, the child had "a hamartia[26] of his left amygdala, a potentially epileptogenic zone." Id. Dr. Shuman stated that

---

[23] Although Dr. Shuman did not provide a cite for this data, it appears to also be from the same textbook. See Pet. Ex. 86 at 7 fig.9. However, not all countries show a linear line from 0 to 15 years of age. See id. For example, data for Spain and Estonia do not begin until after age 15. Id. Iceland's data shows an increase in prevalence until approximately five years of age, with no increase during five to 15 years. Id. And the start of Sweden's data is unclear. Id.

[24] The dentate gyrus is "a serrated strip of gray matter under the medial border of the hippocampus and in its depths; it is an archaeocortex that develops along the edge of the hippocampal sulcus and consists of molecular, granular, and multiform layers." Dentate Gyrus, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=79795 (last visited July 20, 2026).

[25] N.A. is a twin. Pet. Ex. 2 at 3. Dr. Shuman did not opine that she had increased neurodevelopmental morbidity or any abnormality of the brain. See Pet. Ex. 83.

[26] Dr. Shuman defined a hamartia as a "minor maldevelopment [] of the (admittedly epileptogenetic) Amygdala nucleus of the hippocampus." Pet. Ex. 83 at 7 n.5. Dorland's defines hamartia as "a defect in tissue combination during development." Hamartia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=21374 (last visited July 20, 2026).

this case belongs with cases 1, 2, and 4, in the category of "SUDC, Terminal Seizures, Abnormal brain." Id. (emphasis omitted).

Cases 5, 6, and 7 had no brain abnormalities. Pet. Ex. 83 at 7-8 (citing Pet. Ex. 82 at 4 tbl. 2). Case 5 is "the only case without seizures" and "[s]he died with unrecognized/untreated [*H. influenzae*] sepsis." Id. at 7. This toddler had no personal or family history of seizures. Id. Her category is "non-SUDC, No Seizures, Normal brain." Id. Cases 6 and 7 had terminal seizures but no personal or family history of seizures. Id. Case 6 had evidence of Covid bronchiolitis and case 7 had evidence of "multiple viral infections," but the pathology in both was mild and so the infections were not thought to be the primary cause of death. Id. at 7-8. These cases were categorized as "SUDC, Terminal Seizures, Normal Brain." Id. at 8.

In summary, Dr. Shuman places the seven cases into the following three sub-categories:

- SUDC, Terminal Seizure, Abnormal Brain (Cases 1, 2, 3, and 4): 4
- SUDC, Terminal Seizure, Normal Brain (Cases 6 & 7): 2
- Non-SUDC, Death by Non-Seizure Means, Normal Brain (Case 5): 1

He further explained that "[t]he Gould article identifies a series of circumstances or triggers of seizures in toddlers which increase the likelihood of suffering a seizure." Pet. Ex. 83 at 9. Dr. Shuman also acknowledged Gould did not identify the causes of the terminal seizures: "'The cause of the convulsive events in our cases are unknown; mild infections may have lowered the seizure or febrile seizure threshold.'" Id. at 9 n.7 (quoting Pet. Ex. 82 at 7).

**b. Althen Prong One: Whether Petitioners' Provided Preponderant Evidence of a Sound and Reliable Theory to Explain How the MMRV Vaccine Can Cause a Seizure Which Can Lead to Death**

Dr. Shuman opined that Gould identifies "triggers of seizures" that increase the likelihood of having a seizure. Pet. Ex. 83 at 9. He explained that when performing EEGs, physicians may conduct the tests during periods where the seizure threshold is lower to make it more likely to show seizure activity and epilepsy. Id. The seizure threshold is lower during sleep, illness, fever, irritability, restlessness, and sleep deprivation. Id.

Dr. Shuman then diverted from Gould and opined that vaccinations "may predispose" to seizures by "lowering [the] anticonvulsant threshold." Pet. Ex. 83 at 9. According to Dr. Shuman, there are two ways that vaccines lower the seizure threshold. Id. at 9-10. One is by making children "fussy" and difficult to console, which Dr. Shuman stated results in "[s]leep deprivation [which] lowers the anticonvulsant threshold." Id. at 9. The second way is by causing fever. Id. Dr. Shuman stated that "some vaccines generate higher fevers than others, and some children have more profound febrile responses that others." Id. The timing of a fever after vaccination also varies by vaccine. Id. The "generation of the fever," along with "intensity and duration of the fever," are also affected by simultaneous infection with "whatever is circulating at the local nursery school." Id. at 9-10. He concluded that vaccination alters "EEG

epileptiform responses to [] everyday challenges by lowering the toddler's threshold to seize." Id. at 10.

In addition, Dr. Shuman explained that children may be affected by their personal and family histories of febrile seizures. Pet. Ex. 83 at 10. Children who have a personal or family history of seizures "may convulse earlier, longer[,] and [] more severely with febrile seizures than other toddlers of the same age." Id. He stated that some may "die in their crib, unattended, in the middle of sleep (which itself lowers the seizure threshold)." Id.

Dr. Shuman next summarized the "pattern of transition from seizure to death" in the six Gould cases. Pet. Ex. 83 at 10. In the five continuous videos, "a convulsion was identified shortly before death" and lasted 8 to 50 seconds. Id. (quoting Pet. Ex. 82 at 5). Abnormal respiratory sounds or vocalizations were heard in four of the five audio recordings. Id. (citing Pet. Ex. 82 at 5). In five cases, there was agonal, labored, or deep breathing. Id. (citing Pet. Ex. 82 at 5). One child died during the seizure. Id. (citing Pet. Ex. 82 at 5). Two children had post-ictal respirations, and one had emesis with the convulsive event and suspected aspiration. Id. (citing Pet. Ex. 82 at 5).

Dr. Shuman argued that the videos in the Gould study "prove the sudden onset of convulsions[] and the terminal process of death by cardiac and respiratory disruption." Pet. Ex. 83 at 12. Gould "undeniably demonstrates that brief seizures can and do kill children without prior seizures (or any other neurological disorder)." Id.

Medical literature referenced by Dr. Shuman includes two commentaries about the Gould study. Fine[27] noted that the "key finding" of Gould was that "convulsive events preceded death in all cases." Pet. Ex. 87 at 3. Fine further noted that the findings "strongly suggest[]" a relationship between SIDS, SUDC, and SUDEP and a "shared inciting mechanism, that is seizure-related central cardiorespiratory depression." Id. However, Fine acknowledged that "[t]his does not imply that a seizure precedes every case of sudden death." Id. Fine stated that Gould and others "highlight that in some individuals there is likely a link between seizures and sudden death, whether it is a shared pathophysiology between the sudden death syndromes, certain genetic susceptibilities, environmental and biologic factors, or in some cases, a first-time terminal seizure." Id. at 4.

The second commentary, by Goldstein and Poduri,[28] noted that although the Gould study lacked EEG monitoring that would confirm that presence of seizures, "the team largely found consensus that there [was] convulsive activity in their review of the videotapes." Pet. Ex. 88 at 2. Further, Goldstein and Poduri noted that Gould makes a point of stating the children in the study were "representative of all the deceased children in their program's larger cohort." Id. But Goldsten and Poduri disagreed, stating that "[g]iven the small sample size and the possibility of

---

[27] Anthony L. Fine, Through the Lens: Insights into Sudden Death, 24 Epilepsy Curr. 268 (2024). This was also cited as Resp. Ex. AA, Tab 8.

[28] Richard D. Goldstein & Annapuma Poduri, Seizures and Sudden Death Beyond SUDEP, 102 Neurology 1 (2024). This was also cited as Resp. Ex. AA, Tab 11.

ascertainment bias, it is too early to know how generalizable [the Gould] findings are." Id. Goldstein and Poduri questioned the relevance of brain abnormalities, epilepsy-associated genetic findings, the significance of the prone position, and the understanding of febrile seizures. Id. at 2-3. They concluded that "Gould [] took on a key question—do children dying with SUDC have seizure activity before death? This early report suggests we look more closely. It is our hope that such work continues at larger scale with renewed focus and our greater hope that such deaths will ultimately become preventable." Id. at 3.

Hegyi et al.[29] also commented on the Gould article. Pet. Ex. 92. Hegyi et al. stated the Gould conclusion that "seizure may be related to must [SUDC] death in young children . . . implies a likely answer to causation." Id. at 2. But "because the study did not compare the occurrence of seizures in SUDC cases with that of living children," the authors opined "it does not present evidence for an increased risk of death after a seizure in this population." Id. Hegyi et al. also noted the lack of EEG information adds to the "lack of certainty that the children assessed in [Gould] had actual seizures." Id. Hegyi et al. further took issue with Gould "largely dismiss[ing] the potential role of neurodevelopmental compromise reported in approximately 12% of the [R]egistry and the contribution of severe conditions found at autopsy that could have explained the deaths, such as airway obstruction and [*H. influenzae*] sepsis." Id. Lastly, Gould conflated SIDS with SUDC, leading to "possible confusion concerning the role of sleep position and bedding" in these two groups. Id. Six of the children in Gould were found in the prone position, which Hegyi et al. stated "is not a proven risk factor in toddlers" (SUDC) but is an "established risk factor[] of SIDS." Id. Hegyi et al. concluded their criticisms by calling for "[a] more vigorous statement . . . to emphasize the need to investigate multiple associations and warn against premature conclusions of causation." Id.

Gould and Devinsky[30] provided a response to Hegyi et al., agreeing additional data would be helpful but concluding that "audio-video recordings showing a convulsive event before all deaths is the strongest data we have; to ignore it would be unusual from a scientific perspective." Pet. Ex. 91 at 2. They maintained that "[a]ll cases underwent a thorough independent multidisciplinary review of all evidence (medical records, family interviews, whole-exome sequencing, scene investigation[,] and histopathology reviews by cardiac and neurologic and forensic pathologists), including the video recordings, and all potential causes of death were considered." Id. Further, of the five cases with continuous records, which did not include the child with *H. influenzae* sepsis, "[two] epileptologists (with more than 50 years of epilepsy clinical and academic experience combined) and [six] forensic pathologists independently identified clinical events as seizures." Id.

---

[29] Thomas Hegyi et al., Reader Response: Video Analyses of Sudden Unexplained Deaths in Toddlers, 103 Neurology e209344 (2024). This was also filed as Resp. Ex. Z, Tab 2 and Resp. Ex. AA, Tab 12.

[30] Laura Gould & Orrin Devinsky, Author Response: Video Analysis of Sudden Unexplained Deaths in Toddlers, 103 Neurology e209414 (2024). This was also filed as Resp. Ex. AA, Tab 9.

c. **Whether N.A. Suffered a Seizure Prior to Her Death and Althen Prong Two: Whether There is Preponderant Evidence of a Logical Sequence of Cause and Effect**

Dr. Shuman opined that Gould "proves that [N.A.] had a seizure the night she died." Pet. Ex. 83 at 12. He further opined that the "Gould findings [of] 6 SUDC deaths of [t]oddlers are all consistent with the findings of [Petitioners] upon discovering the death of their daughter," N.A., who "fits the profile, situation, and environment in which the Gould SUDCs were proven on video to die with a seizure and its cardiac and respiratory failures in the aftermath." Id. He opined Gould "demonstrates that seizures precede and cause most SUDC deaths. It is undeniable that [N.A.] had SUDC. Therefore, it is far more likely than not that [N.A.] had a seizure that caused her death the night she died." Id.

2. **Respondent's Expert, Dr. Hart G.W. Lidov, M.D., Ph.D.**[31]

a. **Analysis of Gould and Althen Prong One: Whether Petitioners' Provided Preponderant Evidence of a Sound and Reliable Theory to Explain How the MMRV Vaccine Can Cause a Seizure Which Can Lead to Death**

Dr. Lidov opined that the Gould study does not change his prior opinions (expressed in his earlier expert reports). Resp. Ex. AA at 1. He began with a summarization of Gould:

> A group of eight reviewers identified "abnormal movements" in six of seven studied cases and concluded that the abnormal movements were most likely seizures. Further, they suggest[ed] that these seizures were the case of death. They state[d] that they excluded alternative explanations such as a reaction to acute hypoxic/ischemic injury or a cardiac cause based on the absence of pathologic findings or alterations in genes known to be implicated in cardiac disorders. The authors hypothesize[d] that immediate antecedent seizures may occur in "many" cases of SUDC.

Id.

---

[31] Dr. Lidov is a board-certified neuropathologist and pediatric neurologist, licensed in Massachusetts. Resp. Ex. E at 1-2; Resp. Ex. P at 6. He obtained his B.A. in Biophysics, Ph.D. in Anatomy, and M.D. from Johns Hopkins before completing a pediatric internship at Massachusetts General Hospital and residencies in pediatrics, neurology, neuropathology, and anatomic pathology at Massachusetts General Hospital, National Hospital Queens Square in London, UK, and Brigham and Women's Hospital. Resp. Ex. P at 1. He held clinical fellowships in pediatrics, neurology, and pathology and neurology at Harvard Medical School and has been a Professor in pathology and neurology at Harvard Medical School for almost 20 years. Id. at 1-2. Since 1991, he has been a staff Neuropathologist at Boston Children's Hospital and Brigham and Women's Hospital. Id. at 2. He "routinely see[s] surgical neuropathology cases from these hospitals, and autopsy examinations of the [central nervous system], as well as consultations." Resp. Ex. E at 2. Dr. Lidov has authored or co-authored over 100 publications. Resp. Ex. P at 8-16.

After summarizing Gould, Dr. Lidov offered his critiques, beginning with concerns related to data collection and interpretation, which caused him to be skeptical of the results and conclusions. Resp. Ex. AA at 1-2. Regarding data collection, Dr. Lidov explained that as a preliminary matter, the "sample selection is problematic." Id. at 1. The data represented seven out of 301 cases in the SUDCRRC Registry where there was home video recording of "the child's last sleep period." Id. Dr. Lidov characterized home video monitoring of sleep as "unusual," which raised a question in his mind whether there was something unusual or atypical about these seven children that lead to monitoring. Id. at 1-2. He suggested that this question about why the seven children were being monitored made them different from the other children in the study, despite the premise by Gould that all of the children "shared similar demographic features." Id. (quoting Pet. Ex. 82 at 1).

Next, Dr. Lidov questioned the age range of the seven children, from just over age one to over two years of age, older than the SIDS range.[32] Resp. Ex. AA at 2. Dr. Lidov found this age range too wide to assume that all of the children had uniform underlying physiology. Id.

Moving to the interpretation of the data, Dr. Lidov fundamentally questioned whether the "convulsive events" were seizures. Resp. Ex. AA at 2. Dr. Lidov noted Gould does not define what constitutes a "convulsive event," although he presume there was a definition agreed upon by the video reviewers. Id. In Gould, the authors described "shifts from 'abnormal movements' to 'convulsive events' to 'convulsions' without explanation." Id. (quoting Pet. Ex. 82 at 5, 7). Dr. Lidov explained "[t]hese terms can have different meanings and specificity." Id. For example, "abnormal movements" is defined as "not normal or out of the ordinary," which "can encompass all sorts of unusual motions." Id. Dr. Lidov defined "convulsion" as "rapid, involuntary muscle contractions producing arching, shaking, or limb movements." Id. According to Dr. Lidov, seizures can occur with or without "abnormal movements or convulsions" and "involve[] abnormal brain electrical activity demonstrated on an EEG." Id. It is an abnormal EEG that "distinguishes a seizure from the multitude of mimics," which range from "pre-mortem agonal throes" to abnormal movements caused by "acid reflux." Id.

Research cited by Dr. Lidov showed that seizures are difficult to recognize "based on visual observation alone," even for experienced physicians and nurses. Resp. Ex. AA at 2 (citing Resp. Ex. AA, Tabs 1-2). Battaglia et al.[33] studied the ability of "non-epileptologist physicians" to detect epileptic seizures from non-seizure mimics (syncope,[34] hyperkinetic movement

---

[32] SIDS applies to children no older than one year of age, and SUDS applies to children over the age of one. Anklam, 2023 WL 8890662, at *9, *26; see also Pet. Ex. 82 at 2 (indicated the age range for SUDCs to be one to 18 years of age).

[33] Giulia Battaglia et al., Distinguishing Epileptic Seizures from Imitators: A Video-Based Evaluation of Non-Epileptologist Physicians, 166 Epilepsy & Behav. 1 (2025).

[34] Syncope (fainting) is "a temporary suspension of consciousness due to generalized cerebral ischemia." Syncope, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=48477 (last visited July 20, 2026).

episodes, and others). Resp. Ex. AA, Tab 1 at 1. The non-epileptologist physicians included the following specialties: psychiatry, internal medicine, neurology, neurosurgery, emergency medicine, and anesthesiology and intensive care. Id. at 2. Epileptic seizures were correctly diagnosed in 50.3% of the cases and misdiagnosed in 49.7% cases. Id. at 1, 5 tbl.3. The authors concluded that correct diagnosis "can be challenging when relying solely on video recordings." Id. at 1.

Nagy et al.[35] conducted a similar study using videos of "paroxysmal movements" of 15 young infants, ages two days to five months, reviewed by medical students (first year and fourth to fifth years), pediatric residents, pediatric neurologists, and parents. Resp. Ex. AA, Tab 2 at 1. The first-year medical student correct answer rate was the lowest at 36.6%, and pediatric neurologists had the best correct answer rate at 67.4%. Id. The authors concluded that "[r]ecogni[z]ing epileptic seizures in very young infants without EEG is extremely inaccurate." Id. Of note, the etiology of the visible movements seen on video included hypoxic-ischemic encephalopathy,[36] jitteriness, cortical dysplasia,[37] congenital hydrocephalus,[38] benign neonatal

---

[35] Eszter Nagy et al., Epileptic Seizure or Not? Proportion of Correct Judgement Based Only on a Video Recording of a Paroxysmal Event, 53 Seizure 26 (2017).

[36] Hypoxic-ischemic encephalopathy is an encephalopathy ("degenerative disease of the brain") resulting from asphyxia ("pathologic changes caused by lack of oxygen in respired air"). Hypoxic-Ischemic Encephalopathy, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=73088 (last visited July 20, 2026); Encephalopathy, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=16202 (last visited July 20, 2026); Asphyxia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=4494 (last visited July 20, 2026).

[37] Cortical dysplasia is "dysplasia [("abnormality of development")] of the cerebral cortex." Cortical Dysplasia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=72085 (last visited July 20, 2026); Dysplasia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15275 (last visited July 20, 2026).

[38] Congenital hydrocephalus is a hydrocephalus ("a condition marked by dilatation of the cerebral ventricles, most often occurring secondary to obstruction of the cerebrospinal fluid pathways . . . and accompanied by an accumulation of cerebrospinal fluid within the skull") due to "a developmental obstruction of the cerebrospinal fluid pathways." Congenital Hydrocephalus, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=81243 (last visited July 20, 2026); Hydrocephalus, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=23338 (last visited July 20, 2026).

sleep myoclonus,[39] hyperglycinemia,[40] and epileptic spasms. Id. at 2 tbl.1.

Considering the difficulty identifying seizures when relying on videos as reflected by medical literature, Dr. Lidov stated that the Gould videos were reviewed by a team that included "six forensic pathologists," who lacked any "apparent qualification for reviewing the videos and reliably recognizing seizures." Resp. Ex. AA at 2. Dr. Lidov opined that the two epileptologists with experience in reviewing videos "might be the only appropriate evaluators." Id. Further, in Gould ,there was "disagreement between the reviewers about the presence of a 'convulsive event' in three of the seven cases." Id.

Dr. Lidov also expressed concern about the timing of the terminal seizures, noting that they "seemed frequently to be brief, 20-50 seconds, and the movements occurred at widely varying time intervals before death," with some occurring "an hour before death" and others "essentially simultaneous" with death. Resp. Ex. AA at 2. For example, in Case 2, movement occurred seconds before death, and in Case 6, movement occurred over an hour before death. Id. at 2-3. The time of death was defined as "the last sign of life observed." Id. at 3. Due to the different duration of the movements and the timeframe between the movements and death, Dr. Lidov opined "[i]t seem[ed] doubtful that intervals which range from minutes to hours all reflect the same mechanism." Id.

Turning to causal mechanisms, Dr. Lidov explained that convulsions can occur due to syncope, which is not fatal, and is a "manifestation of cerebral anoxia." Resp. Ex. AA at 3. He cited a neurology text[41] that defined syncope as an "episodic loss of consciousness and postural tone and an inability to stand because of a diminished flow of blood to the brain." Resp. Ex. AA, Tab 3, at 2. When unconsciousness lasts 15 to 20 seconds, "some motor activity is commonly observed. The term convulsive syncope has been used to describe this movement phenomenon, but it has also been used for an authentic seizure caused by a prolonged period of brain hypoxia."[42] Id. at 5 (emphasis omitted). Dr. Lidov stated that Gould recognized that in at least

---

[39] Myoclonus is "shocklike contractions of a portion of a muscle, an entire muscle, or a group of muscles, restricted to one area of the body or appearing synchronously or asynchronously in several areas. It may be part of a disease process (e.g., epileptic or post-anoxic myoclonus) or be a normal physiologic response (e.g., nocturnal myoclonus)." Myoclonus, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=32802 (last visited July 20, 2026).

[40] Hyperglycinemia is the "excess of glycine in the blood or other body fluids." Hyperglycinemia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=23809 (last visited July 20, 2026).

[41] Faintness and Syncope, in Adams and Victor's Principles of Neurology (Allan H. Ropper et al. eds., 12th ed. 2023).

[42] Hypoxia is the "reduction of oxygen supply to tissue below physiologic levels despite adequate perfusion of the tissue by blood." Hypoxia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=24462 (last visited July 20, 2026).

one case (Case 1), convulsions could not be attributed to epilepsy since they could not reliably be distinguished from convulsions caused by cardiac triggered cerebral hypoxia. Resp. Ex. AA at 3 (citing Pet. Ex. 82 at 7). Based on this phenomenon, Dr. Lidov opined "[i]t is not possible to distinguish" convulsions caused by epilepsy from those caused by cardiac-induced cerebral anoxia (brain hypoxia). Id.

Due to his concerns, Dr. Lidov viewed Gould as a study of "an association of movements of an indeterminate nature" in children with SUDC. Resp. Ex. AA at 3. Gould "does not reliably demonstrate that these movements are seizures, or that they are the cause of death. As the authors acknowledge, these are simply observations." Id. To make sense of the results in Gould, Dr. Lidov explained that background information is needed for comparison to address the question of whether the movements seen in the videos are also seen in children who are sleeping and do not die. Id. Without such comparison, it is not known whether the abnormal movements are "possibly [] a normal component of sleep." Id.

In the alternative, Dr. Lidov opined that the events seen in the Gould videos may be "part of the dying process, from whatever cause." Resp. Ex. AA at 3. His opinion in this regard is based on the fact that the seven cases "appear to have many 'red flags' pointing to infectious processes, as well as respiratory challenge, which may implicate hypoxia as a cause of death." Id. To be clear, Dr. Lidov does not question that SUDC involves an "aberrant process" of the nervous system, but he questioned whether that process "manifests as a seizure." Id.

As discussed above, based on the studies he cited, Dr. Lidov disagreed that a "seizure [] can be reliably recognized." Resp. Ex. AA at 3. Dr. Lidov pointed out that the underlying assumption that a seizure can be "reliably recognized" is "the foundation of the Gould article." Id. Because he does not accept this foundational assumption, he questioned the conclusions reached in Gould, that six out of seven cases show "convulsive moments," that these cases represent the majority of SUDC cases, and that the observable movements are seizures which may cause death. Id. at 3-4.

Moreover, Dr. Lidov asserted that if Gould's conclusions were accurate, he would expect published case reports of witnessed seizures followed by death in otherwise healthy children. Resp. Ex. AA at 4. However, witnessed SUDC deaths are very rare, and the case reports that do exist do not describe "unusual activity or behavior." Id. (citing Resp. Ex. AA, Tab 4, at 6 ("The functional basis of SUDC remains poorly defined partly because witnessed deaths are extremely rare.");[43] Resp. Ex. AA, Tab 5 at 1 ("Witnessed reports of sudden death are rare, but critical to deciphering its mechanism(s).");[44] Resp. Ex. AA, Tab 6 at 1-2 (agreeing "witnessed SIDS is rare

---

[43] Declan McGuone et al., Sudden Unexplained Death in Childhood: A Neuropathology Review, 11 Frontiers Neurol. 1 (2020).

[44] Hanna C. Kinney et al., Witnessed Sleep-Related Seizure and Sudden Unexpected Death in Infancy: A Case Report, 9 Forensic Sci. Med. Pathol. 418 (2013).

but . . . does occur" and noting that movements made in a 3.5 month old prior to death were "described [] as the sort of movements and sounds that all sleeping babies make")).[45]

Subsequent literature citing Gould was reviewed by Dr. Lidov to evaluate feedback of the study by the medical community. Resp. Ex. AA at 4-5. Galetta et al.,[46] for example, stated that Gould, and the exchange between Hegyi et al. and Gould and Devinsky thereafter, "highlight[ed] the considerable methodological challenges involved in conclusively disentangling the causes of death even when the final moments are captured on video." Resp. Ex. AA, Tab 7 at 1 (citing Pet. Exs. 82, 91-92). Galetta et al. stated "'it remains unclear how representative these recorded cases are of the overall population of children with sudden unexplained deaths," and thus, "the role of terminal seizures in these children warrants further attention.'" Id.

Dr. Lidov also cited to Goldsten and Poduri, who noted Gould's "weaknesses, lack of EEG, selection bias, [and] the possibility of other cardiac genes." Resp. Ex. AA at 5 (citing Pet. Ex. 88 at 2). They concluded that "[g]iven the small sample size and the possibility of ascertainment bias, it is too early to know how generalizable their [the Gould] findings are" and called for further investigation. Pet. Ex. 88 at 2.

The most positive review was from Fine, according to Dr. Lidov. Resp. Ex. AA at 5 (citing Pet. Ex. 87). Fine stated that Gould and others "highlight that in some individuals there is likely a link between seizures and sudden death, whether it is a shared pathophysiology between the sudden death syndromes, certain genetic susceptibilities, environmental and biologic factors, or in some cases, a first-time terminal seizure." Pet. Ex. 87 at 4. Overall, the literature, according to Dr. Lidov, is "simply applauding continued work on SIDS/SUDC, not examining and endorsing the authors' specific conclusion." Resp. Ex. AA at 5.

Dr. Lidov concluded that even "if one accepts all of Gould's suppositions, irrespective of their weaknesses, the most one can say is that it is possible, not probable, that a proximate seizure could cause SUDC." Resp. Ex. AA at 6.

#### b. Whether N.A. Suffered a Seizure Prior to Her Death and Althen Prong Two: Whether There is Preponderant Evidence of a Logical Sequence of Cause and Effect

Dr. Lidov opined that that Gould article did not change his opinion that there "was no evidence that [N.A.] had a seizure of any sort." Resp. Ex. AA at 6. His "conclusion from the Gould article that [a seizure] might be possible does not alter the contention for [N.A.] that there is no evidence that a febrile seizure occurred. The Gould article does not change that." Id.

---

[45] Brad Randall, Witnessed Sudden Infant Death Syndrome: A Case Report, 1 J. Sudden Infant Death Syndrome & Infant Mortality 55 (1996).

[46] Steven L. Galetta et al., Editors' Note: Video Analyses of Sudden Unexplained Deaths in Toddlers, 103 Neurology e209649 (2024).

The central issue identified by Dr. Lidov is whether N.A. had a febrile seizure; however, he noted "Gould only minimally discusses febrile seizures." Resp. Ex. AA at 5. Regarding N.A., he opined that there is "no suggestion" of evidence of "agonal movement or vocalization." Id. NA's bedroom had an audio and video monitor with night vision and temperature monitoring, but there is no evidence of agonal movement or vocalization. Id. (citing Pet. Ex. 1 at ¶ 15 (N.A.'s mother averring that "[they] didn't hear anything that night").

Further, Dr. Lidov opined that in Gould the relationship of febrile seizures to sudden death is "ambiguous," because it is not clear which of the cases involved fever. Resp. Ex. AA at 5. Only one child was documented to have had a febrile seizure (Case 6), but Dr. Lidov noted that the source of this information was not provided. Id. Although some of the other children had "circumstances which might implicate a febrile seizure" (e.g., cold symptoms, ill family member, autopsy findings suggestive of infection, and sepsis), Dr. Lidov stated that only two children may have had febrile seizures (Cases 6 and 7). Id. And while Petitioners posit that N.A. had a febrile seizure, Dr. Lidov stated there is no evidence that she had "abnormal movements, agonal vocalizations, or a seizure, let alone a febrile seizure, or a fatal first febrile seizure." Id.

In addition to the lack of evidence that N.A. had a febrile seizure or a seizure, Dr. Lidov also noted that there was a difference between N.A.'s age and the children in Gould. Resp. Ex. AA at 5. NA was younger, with only one child (Case 5, age 13 months) close in age to N.A., who was 12 months old.[47] Id. All seven cases were over the age of one year, and three were almost two years old. Id. Dr. Lidov explained that N.A.'s younger age raises a "plausibl[e]" question about whether there was "something pathophysiologically different" as compared with the older children ("distinct from SIDS"). Id.

Lastly, Dr. Lidov opined that abnormal brain pathology distinguishes N.A. from three of the children in Gould. Resp. Ex. AA at 5. Three cases had "changed hippocampal pathology," whereas N.A. did not have abnormal pathology. Id.

Dr. Lidov stated that if Gould "says anything about [N.A.] and febrile seizures, it may be that febrile seizures are not fatal" because one of the seven children (Case 3) had "a prior non-fatal febrile seizure, [and] therefore did have the permissive physiology for a febrile seizure." Resp. Ex. AA at 6. Thus, he viewed the prior non-fatal febrile seizure as a "febrile seizure stress test" where "the initial outcome was benign." Id. Dr. Lidov concluded that because a seizure "might be possible" does not change his opinion here that "there is no evidence that a febrile seizure occurred." Id.

[47] N.A.'s date of birth was June 18, 2015, and the date of vaccination was June 23, 2016. Pet. Ex. 2 at 3; Pet. Ex. 4 at 34.

### 3. Respondent's Expert, Dr. Christine McCusker, M.D.[48]

Dr. McCusker began by providing her analysis of Gould. Resp. Ex. Z at 2. Gould is a descriptive study of seven sudden death cases where the final moments prior to death were recorded and analyzed. Id. Six of the children had autopsy evidence of infection, with four respiratory tract infections and one case of *H. influenzae* sepsis. Id. All of the children were found in the prone position, and one child's whose face was to the side had an airway occluded with food. Id. Cause of death was asphyxia. Id. Video analysis was done with independent reviewers (six forensic pathologists, a pediatric epileptologist, and a sleep medicine/epileptologist physician), though there was disagreement between the reviewers. Id. Three of the six reviewers agreed that four of the videos showed abnormal movements, but disagreed about the three other cases. Id. Of the four cases where three out of the six reviewers agreed, two were children who died of asphyxia caused by airway obstruction. Id. Only one child had a history of a febrile seizure. Id. In the videos where reviewers did not reach agreement, all had evidence of infection, including one with sepsis, one with bronchiolitis, and one with respiratory syncytial virus ("RSV") and parainfluenza infection. Id.

Specific to each case, Dr. McCusker had the following opinions:

1. Case 1 began with agonal breathing followed by a brief period of convulsive movements (8 seconds) and then terminal agonal breathing for an additional 5 minutes. This child died with airway obstructed with food. Abnormal movements began after abnormal, agonal breathing, and thus if these movements represented seizure activity, they were most likely induced by hypoxia.
2. Case 2 had evidence of airway obstruction, and the child was face down prior to onset of the abnormal movements. It is likely that this child also suffered from hypoxia and died of asphyxia.
3. Case 3, the child with a personal history of febrile seizures, developed abnormal movements for 40 seconds, followed by labored breathing-face

---

[48] Dr. McCusker received a B.Sc. in microbiology and immunology, M.Sc. in molecular biology, and M.D. in Ontario, Canada. Resp. Ex. A at 1; Resp. Ex. O at 1. She then completed a pediatric residency, fellowship in immunology, and a fellowship in allergy and immunology. Resp. Ex. O at 2. She obtained board certification from the American Board of Pediatrics and is certified in pediatrics and allergy and clinical immunology in Canada. Id.; Resp. Ex. A at 1. Dr. McCusker's "research focus is the regulation of the immune responses." Resp. Ex. A at 1. She treats an average of 50-120 children per week in allergy and clinical immunology as well as urgent care general pediatrics. Id. at 2. Throughout her career, she has held various university and hospital appointments and she has authored or co-authored over 100 publications. Resp. Ex. O at 3-4, 33-46.

obstructed by a pillow for 25 minutes before cessation of breathing. Hypoxia or hypercapnia[49] are most likely to have occurred in this child.

4. Case 4 developed abnormal movements for 50 seconds, followed by death approximately 5 minutes after the end of these movements. Child was found prone, face down.
5. Case 5- abnormal movements or sounds identified. She was found prone and had evidence of bacterial sepsis post mortem.
6. Case 6 had evidence of airway congestion. During the recording there was evidence of labored breathing and the child sneezed. He extended himself, sat up and then returned to the prone position, now face down in a pillow. This movement was considered *by some of the reviewers* to be suggestive of seizure activity. As in other cases noted previously, breathing abnormalities preceded these movements.
7. Case 7 was recorded face prone. He developed abnormal movements for 25 seconds followed by abnormal breathing pattern for 5 minutes. He was found to have RSV and parainfluenza infections of his airways.

Resp. Ex. Z at 2-3. Dr. McCusker stated that the reviewers concluded that "abnormal movements, suggestive of seizures were found in 6/7 children. There was concordance amongst 3/6 reviewers in only 4 cases. All cases had asphyxia risks." Id. at 3.

In addition to the lack of agreement amongst the reviewers regarding whether the movements were seizure related, Dr. McCusker also expressed concern about the lack of a control group of infants videoed during sleep "to determine [whether] these movements are unique to the moments of death." Resp. Ex. Z at 3. Further, even if the movements were seizures, Dr. McCusker questioned whether the children died due to the seizures or whether the seizures were secondary to hypoxia/hypercarbia, like two of the children in Gould (Cases 1 and 2). Id. at 4. And there was only one child who had a fever prior to death (Case 2). Id. For these reasons, Dr. McCusker opined that it was "reasonable to hypothesize that the most likely cause of death was hypoxia/asphyxia and not seizure." Id.

Next, Dr. McCusker cited to the criticisms of Gould from Hegyi et al. Resp. Ex. Z at 3. First, she noted that Hegyi et al. stated that "because the study did not compare the occurrence of seizures in SUDC cases with that of living children, it does not present evidence for an increased risk of death after a seizure in this population." Resp. Ex. Z at 4 (quoting Pet. Ex. 92 at 2). Second, "without the performance of EEGs, there is a lack of certainty that the children in [Gould] had actual seizures." Id. (quoting Pet. Ex. 92 at 2).[50]

---

[49] Hypercapnia is "excess of carbon dioxide in the blood." Hypercapnia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=23704 (last visited July 20, 2026).

[50] For more on the remarks in Hegyi et al., see supra Section II.C.1.b.

Like Dr. Lidov, Dr. McCusker cited medical literature describing the difficulty associated with diagnosing seizures based on video recordings in children. Resp. Ex. Z at 3. Leibetseder et al.[51] noted that "[t]he rate of misdiagnosis of epilepsy and non-epileptic events is high" and "[t]here is no single semiological feature that distinguishes between epileptic seizures and non-epileptic events." Resp. Ex. Z, Tab 4 at 15.

Specific to N.A., Dr. McCusker reiterated that Petitioners assert that the vaccines N.A. received on June 23, 2016, "lead to her death on July 1, 2016." Resp. Ex. Z at 2. After consideration of Gould, Dr. McCusker opined to a reasonable degree of medical certainty that N.A. "was found prone and face down with feet through the slats of the crib, which may have impeded her ability to turn over in deep sleep, leading to hypoxia/hypercarbia. There is no evidence supporting seizure activity. The work of Gould [] is not relevant or affective of outcome." Id. at 4.

## III. DISCUSSION

### A. Standards for Adjudication

The Vaccine Act was established to compensate vaccine-related injuries and deaths. § 10(a). "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" Rooks v. Sec'y of Health & Hum. Servs., 35 Fed. Cl. 1, 7 (1996) (quoting H.R. Rep. No. 908 at 3, reprinted in 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioners' burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991). Petitioners need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1325 (Fed. Cir. 2006). Instead, Petitioners may satisfy their burden by presenting circumstantial evidence and reliable medical opinions. Id. at 1325-26.

In particular, Petitioners must prove that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly, 592 F.3d at 1321 (quoting Shyface v. Sec'y of Health & Hum. Servs., 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); see also Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d 1352, 1355 (Fed. Cir. 2006). The received vaccine, however, need not be the predominant cause of the injury. Shyface, 165 F.3d at 1351. A petitioner who satisfies this burden is entitled to compensation unless Respondent can prove, by a preponderance of the evidence, that the vaccinee's injury is "due to factors

[51] Annette Leibetseder et al., How to Distinguish Seizures from Non-Epileptic Manifestations, 22 Epileptic Disord. 716 (2020).

unrelated to the administration of the vaccine." § 13(a)(1)(B). However, if a petitioner fails to establish a prima facie case, the burden does not shift. Bradley v. Sec'y of Health & Hum. Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

"Regardless of whether the burden ever shifts to the [R]espondent, the special master may consider the evidence presented by the [R]espondent in determining whether the [P]etitioner has established a prima facie case." Flores v. Sec'y of Health & Hum. Servs., 115 Fed. Cl. 157, 162-63 (2014); see also Stone v. Sec'y of Health & Hum. Servs., 676 F.3d 1373, 1379 (Fed. Cir. 2012) ("[E]vidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question."); de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d 1347, 1353 (Fed. Cir. 2008) ("The government, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the [P]etitioner's evidence on a requisite element of the [P]etitioner's case-in-chief."); Pafford, 451 F.3d at 1358-59 ("[T]he presence of multiple potential causative agents makes it difficult to attribute 'but for' causation to the vaccination. . . . [T]he Special Master properly introduced the presence of the other unrelated contemporaneous events as just as likely to have been the triggering event as the vaccinations.").

**B. Factual Issues**

Petitioners must prove, by a preponderance of the evidence, the factual circumstances surrounding their claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records).

Medical records, specifically contemporaneous medical records, are presumed to be accurate and generally "warrant consideration as trustworthy evidence." Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). But see Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejecting the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 538 (2011) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." (quoting Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991), aff'd per curiam, 968 F.2d 1226 (Fed. Cir. 1992))), recons. den'd after remand, 105 Fed. Cl. 353 (2012), aff'd mem., 503 F. App'x 952 (Fed. Cir. 2013). The weight afforded to contemporaneous records is due to the fact that they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." Id. To overcome the presumptive accuracy of medical records, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." Sanchez v. Sec'y of Health & Hum. Servs., No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing Blutstein v. Sec'y of Health & Hum. Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)), mot. for rev. denied, 142 Fed. Cl. 247 (2019), vacated on other grounds & remanded, 809 F. App'x 843 (Fed Cir. 2020).

There are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Lowrie v. Sec'y of Health & Hum. Servs., No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting Murphy, 23 Cl. Ct. at 733). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley, 991 F.2d at 1575.

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. Valenzuela v. Sec'y of Health & Hum. Servs., No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); see also Eng v. Sec'y of Health & Hum. Servs., No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by them").

### C. Causation

To receive compensation through the Program, Petitioners must prove either (1) that N.A. suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that she received, or (2) that N.A. suffered an injury that was actually caused by a vaccination. See §§ 11(c)(1), 13(a)(1)(A); Capizzano, 440 F.3d at 1319-20. Petitioners must show that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly, 592 F.3d at 1321 (quoting Shyface, 165 F.3d at 1352-53).

Because Petitioners do not allege N.A. suffered a Table Injury, they must prove a vaccine N.A. received caused her injury. To do so, Petitioners must establish, by preponderant evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen, 418 F.3d at 1278.

The causation theory must relate to the injury alleged. Petitioners must provide a sound and reliable medical or scientific explanation that pertains specifically to this case, although the explanation need only be "legally probable, not medically or scientifically certain." Knudsen v. Sec'y of Health & Hum. Servs., 35 F.3d. 543, 548-49 (Fed. Cir. 1994). Petitioners cannot establish entitlement to compensation based solely on their assertions; rather, a vaccine claim must be supported either by medical records or by the opinion of a medical doctor. § 13(a)(1). In determining whether a petitioner is entitled to compensation, the special master shall consider all material in the record, including "any . . . conclusion, [or] medical judgment . . . which is contained in the record regarding . . . causation." § 13(b)(1)(A). The undersigned must weigh

the submitted evidence and the testimony of the parties' proffered experts and rule in Petitioners' favor when the evidence weighs in their favor. See Moberly, 592 F.3d at 1325-26 ("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence."); Althen, 418 F.3d at 1280 (noting that "close calls" are resolved in a petitioner's favor).

Testimony that merely expresses the possibility—not the probability—is insufficient, by itself, to substantiate a claim that such an injury occurred. See Waterman v. Sec'y of Health & Hum. Servs., 123 Fed. Cl. 564, 573-74 (2015) (denying a petitioner's motion for review and noting that a possible causal link was not sufficient to meet the preponderance standard). The Federal Circuit has made clear that the mere possibility of a link between a vaccination and a petitioner's injury is not sufficient to satisfy the preponderance standard. Moberly, 592 F.3d at 1322 (emphasizing that "proof of a 'plausible' or 'possible' causal link between the vaccine and the injury" does not equate to proof of causation by a preponderance of the evidence); Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1359-60 (Fed. Cir. 2019). While certainty is by no means required, a possible mechanism does not rise to the level of preponderance. Moberly, 592 F.3d at 1322; see also de Bazan, 539 F.3d at 1351.

## IV. FACTUAL ANALYSIS

As Federal Circuit precedent establishes, factual analysis is important and relevant in certain cases prior to engaging in the Althen analysis. Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010). Since "each prong of the Althen test is decided relative to the injury[,]" determining facts relating to the claimed injury can be significant. Id.

In the initial decision, the undersigned found that Petitioners did not provide preponderant evidence that N.A. suffered a seizure prior to her death.[52] The undersigned revisits that finding now in light of Gould and the other new evidence. For the following reasons, the undersigned finds that Gould and the new evidence does not change the prior finding that Petitioners have not proven by preponderant evidence that N.A. suffered a seizure prior to her death.

The initial factual determination was based on N.A.'s individual history, the history of events surrounding N.A.'s death, consideration of her family history, the autopsy and opinions of the pathologist who conducted the autopsy, and the case review by the SUDCRRC.

Regarding N.A.'s individual history, she did not have a history of seizures, febrile, or otherwise, and her medical records did not identify a history of any prior seizures. During

[52] Additionally, in the initial Decision, the undersigned found that there was not preponderant evidence that N.A. had hippocampal or medullary abnormalities or any other brain abnormality. See Anklam, 2023 WL 8890662, at *38. That factual finding is not revisited here because Gould does not provide relevant evidence specific to N.A.'s neuropathology. Further, the parties' experts did not question or challenge the undersigned's finding in this regard. Thus, the prior finding relative to N.A.'s neuropathology remains unchanged.

periods of prior illness, when N.A. had a fever, she did not experience a seizure. She had also received routine childhood vaccinations prior to the vaccinations at issue, and she did not have a febrile seizure associated with her vaccinations. On the evening prior to her demise, N.A.'s mother noted that she had a low-grade fever and Motrin was administered. Her low-grade fever was not elevated to the level that is reportedly associated with febrile seizures. See, e.g., Pet. Ex. 16 at 3 ("[Febrile seizures] were defined as a seizure associated with illness or fever of ≥ 101°F . . . .");[53] Resp. Ex. E, Tab 4 at 2 ("The most significant risk factor for the development of a first febrile seizure is the height of the temperature; the higher the temperature, the higher the likelihood of a febrile seizure. . . . Most children have a temperature of at least 39°C [102.2°F] at the time of a seizure.").[54] Thus, there is no evidence from N.A.'s history to suggest that she ever had a seizure, that illnesses or vaccinations which cause fever ever triggered a seizure, or that she ever had a febrile seizure. The Gould study showed that one of the children had a personal history of febrile seizures. That characteristic is not, however, applicable to N.A., and thus, is not relevant to the question of whether N.A. had a seizure.

N.A. did have a family history of febrile seizures; her brother had several febrile seizures. In the initial decision, the undersigned found that the medical literature showed that this fact may have increased N.A.'s risk to have a febrile seizure, but that the increased risk did not establish preponderant evidence that N.A. had a febrile seizure. See Tr. 58, 60, 62 (Dr. Miller testifying that this is a "rare event"). In Gould, one child had a family history of febrile seizures (as well as epilepsy), and that child also had a personal history of febrile seizures. Gould noted that in their Registry cases of children who died prior to 60 months of age (248 children), 29.4% had febrile seizures, which was "consistent with previous studies implicating febrile seizures in some of these deaths." Pet. Ex. 82 at 6. Gould did not offer additional evidence that affects the undersigned's prior finding. Thus, the undersigned again finds that N.A.'s family history may have increased her risk of seizures, but that an increased risk does not establish preponderant evidence that N.A. did have a febrile seizure prior to her death.

Next, Dr. Virani, the pathologist who conducted the autopsy, did not opine or suggest that a seizure was a contributing factor to the cause of death. N.A.'s case was reviewed by the SUDCRRC, and they conducted a thorough investigation, including a review of records, histology tissue review by a cardiac pathologist and neuropathologist, and genetic analyses. They did not conclude that N.A. had a seizure. There was no physical evidence to suggest that N.A. had a seizure. As explained by Crandell et al.,[55] "[p]ostmortem evidence of [a] terminal seizure is often absent or nonspecific." Pet. Ex. 72 at 7. "Common stigma" may include tongue biting or urinary incontinence. Id. Due to N.A.'s age, urinary incontinence could not be evaluated. But there was no description in N.A.'s autopsy to suggest tongue biting.

[53] Dale C. Hesdorffer et al., Sudden Unexplained Death in Childhood: A Comparison of Cases with and Without a Febrile Seizure History, 56 Epilepsia 1294 (2015).

[54] Alexander K.C. Leung & W. Lane M. Robson, Febrile Seizures, 21 J. Pediatric Health Care 250 (2007).

[55] Laura Gould Crandall et al., Potential Role of Febrile Seizures and Other Risk Factors Associated with Sudden Deaths in Children, 2 JAMA e192739 (2019).

Gould addressed such evidence, noting that "[t]ongue contusions complicate some epileptic convulsions, including [in] one of [their] cases," Case 1; however, Gould stated that this type of evidence "cannot [] reliably distinguish[]" between convulsions due to epilepsy from those caused by "cardiac-induced cerebral hypoxia." Pet. Ex. 82 at 7. Since there was no evidence that N.A. sustained tongue contusions, and because Gould did not find this type of physical evidence was specific to convulsions caused by epilepsy, it is not relevant here.

The undersigned's initial Decision discussed Dr. Virani's finding of pulmonary edema at autopsy, and noted that Dr. Virani did not opine that the finding suggested or supported febrile seizure as a cause of death. Gould did not discuss pulmonary edema, and it is not known whether it was found on autopsy in any of the seven children studied. Thus, the undersigned's prior finding on this point is unchanged.

Previously, Dr. Kinsbourne testified that N.A.'s body configuration suggested a seizure, but he did not explain what about the configuration weighed in favor of finding that a seizure occurred. Further, he did not cite any foundational evidence in support of this opinion. Dr. Vargas rejected Dr. Kinsbourne's opinion that there was any unusual posture suggesting a seizure. Her opinion on this topic was more persuasive, especially given that Dr. Vargas is a practicing pathologist, and Dr. Kinsbourne was long removed from clinical practice and did not have expertise in forensic pathology or death investigations.[56]

In Gould, all seven children were found prone, and six were "prone with face down." Pet. Ex. 82 at 1. In the Registry, of the 248 children 60 months of age and younger, 194 (83.1%) were found prone, with 125 (54.1%) face prone. Id. at 3 tbl. 1. Although Gould noted that all seven children were prone with the majority face down, Gould did not discuss the implications of the body and face position other than noting all had risk of asphyxia. Id. at 6. N.A. was found in the prone position with her face down.

Petitioner's expert on Remand, Dr. Shuman, opined that Gould proved that N.A. had a seizure the night that she died, and that aspect of his opinion is discussed in more detail below in the Althen prong two analysis.

Respondent's expert, Dr. Lidov, averred that Gould did not change his opinion that there was no evidence N.A. had a seizure. He noted N.A.'s bedroom had audio video monitors with night vision and temperature monitoring but there was no evidence of agonal movement or vocalization like that reported in the Gould cases.

Respondent's expert, Dr. McCusker, placed emphasis on N.A.'s prone position, and opined there was no evidence supporting seizure activity. She concluded that Gould was not relevant or affective of outcome.

---

[56] See Pet. Ex. 14 (noting no expertise in forensic pathology); Tr. 90 (noting he is no longer a practicing physician since 1981).

To the extent that Gould sheds new light on the factual question of whether N.A. had a seizure, the undersigned finds that it provides an additional fact that weighs against a finding that a seizure occurred. In four of the five cases where sound monitoring was available (Cases 1, 2, 3, and 6), there were abnormal sounds, described as agonal breathing (Case 1), abnormal vocalizations (Cases 2 and 6), and labored breathing (Case 3). Gould stated that "Asian cultures name this syndrome after the 'loud groan' heard during sleep before death, suggesting a possible 'ictal vocalization.'" Pet. Ex. 82 at 6. As pointed out by Dr. Lidov, in N.A.'s case, there was no evidence of abnormal vocalizations to support the occurrence of a seizure.

Also noted by Dr. Lidov, in Gould there was neuropathological evaluation of the brain in six of the seven cases, and in three of the six, there were abnormal changes in the hippocampal dentate gyrus (Cases 1, 2, and 4), previously reported in SUDC. The undersigned found that N.A. did not have hippocampal abnormalities in her brain tissue on pathological evaluation. Gould noted that the "specificity of hippocampal dentate gyrus changes in SUDC ha[ve] been questioned." Pet. Ex. 82 at 6. Further, Gould concluded that in the six cases the hippocampal abnormalities "did not correlate" with a history of febrile seizures. Id. Thus, importance of the finding of abnormal brain tissue in Gould is not clear.

In summary, the undersigned makes one finding after consideration of Gould and the new expert opinions. The undersigned finds there is no evidence that N.A. had abnormal vocalizations the night that she died. Although Gould discussed the abnormal vocalizations, it is not clear that they reached conclusions about whether these sounds were evidence of a seizure. To the extent that Gould suggested that abnormal vocalization was evidence of a seizure, the undersigned finds that the lack of evidence of abnormal vocalizations by N.A. weighs against a finding of that she had a seizure. This finding, however, is not determinative.

Therefore, the undersigned finds that Gould and the newly filed evidence does not otherwise change the undersigned's initial finding of fact that there is not preponderant evidence that N.A. suffered a seizure.

## V. CAUSATION ANALYSIS

On remand, the causation-related questions are whether, after consideration of Gould, the parties' expert reports, and additional medical literature, (1) Petitioners have provided preponderant evidence of a sound and reliable theory to explain how the MMRV vaccine can cause a seizure which can lead to death (Althen Prong One) and (2) Petitioners have provided preponderant evidence that N.A. suffered a seizure prior to her death (Althen Prong Two). After consideration of all the evidence filed after reopening the record, the undersigned finds that the evidence on Althen prongs one and two does not preponderant in favor of Petitioners.

### A. Althen Prong One

Under Althen prong one, Petitioners must set forth a medical theory explaining how the received vaccine could have caused the sustained injury. Andreu, 569 F.3d at 1375; Pafford, 451 F.3d at 1355-56. Petitioners' theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. Boatmon,

941 F.3d at 1359; see also Knudsen, 35 F.3d at 548; Veryzer v. Sec'y of Health & Hum. Servs., 98 Fed. Cl. 214, 223 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"). If Petitioners rely upon a medical opinion to support their theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. See Broekelschen, 618 F.3d at 1347 ("The special master's decision often times is based on the credibility of the experts and the relative persuasiveness of their competing theories."); Perreira v. Sec'y of Health & Hum. Servs., 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing Fehrs v. United States, 620 F.2d 255, 265 (Ct. Cl. 1980))).

The undersigned acknowledged in her initial Decision that the parties stipulated that the MMRV vaccine can cause febrile seizures. However, the undersigned found Petitioners failed to provide preponderant evidence of a sound and reliable theory to explain how the MMRV vaccine can cause a seizure in a vulnerable child which can lead to death.

Petitioners' experts opined that the MMRV vaccine caused a febrile seizure in the context of hippocampal and medullary brain abnormalities, rendering the child vulnerable to sudden unexplained death. As such, Petitioners' theory of causation, as explained in the initial Decision, relied on two factual presumptions: (1) that a febrile seizure occurred before death and (2) that there were brain abnormalities that increased the risk of sudden death. Because there was not preponderant evidence of these two facts, Petitioners' causal theory failed.

As set forth above, Gould and the other newly filed evidence does not change the undersigned's finding that there is not preponderant evidence that N.A. suffered a seizure.

In the initial Decision, even if there had been factual support for Petitioners' theory, there were additional reasons the undersigned found that Petitioners failed to provide evidence of a sound and reliable theory by preponderant evidence.[57] One of these reasons included the language used by Petitioners' experts Dr. Miller and Dr. Kinsbourne to express their opinions, suggesting they held their opinions to a lower threshold than the preponderant standard required by the Vaccine Act. Anklam, 2023 WL 8890662, at *39. A second reason was that Petitioners' opinion that an increased risk of having a seizure, when the likelihood is still very low, does not rise to the level of preponderant evidence. Id. The new evidence does not add to or subtract from the undersigned's previous findings related to these two reasons.

The third reason for the undersigned prior finding was that Petitioners' causal theory related to pathological abnormalities was controversial and thus not sound and reliable, particularly the hypothesis advanced by Dr. Kinney and her colleagues related to hippocampal abnormalities. Anklam, 2023 WL 8890662, at *40. Literature filed by Respondent's experts

---

[57] The undersigned's rulings as to the factual predicates proposed by Petitioners were not determinative as to Althen prong one because there were independent reasons that Petitioners failed to prove Althen prong one as explained in the initial Decision. See Anklam, 2023 WL 8890662, at *39-41.

suggested that the hippocampal abnormalities described by Kinney et al. were not pathological but "normal variants" and not unique to children who have seizures or epilepsy. Id.[58]

Gould addressed the question of hippocampal abnormalities, stating that "[h]ippocampal anomalies on neuropathology, supportive of potential epilepsy-related causes of deaths, have been identified in sudden explained child deaths." Pet. Ex. 82 at 2. In Gould, neuropathology evaluation of the brain was available in six of the seven cases. Id. at 5. Only three of the six showed hippocampal changes, and none of these children had a history of febrile seizures. Id. The one child with a history of febrile seizures did not have hippocampal changes, and the pathological evaluation was described as "within normal limits." Id. When discussing their findings, Gould acknowledged that the "specificity" of hippocampal changes in SUDC "has been questioned." Id. at 6. Gould concluded that "[h]ippocampal findings in [their] cases did not correlate with a febrile seizure history." Id.

Dr. Shuman discussed that the fact that three children in the Gould study had abnormal hippocampal pathology and suggested it was supportive of SUDC deaths due to terminal seizures. See Pet. Ex. 83 at 7-8. However, Dr. Shuman did not clearly state any opinion on this point, and did not explain why this information was relevant to Althen Prong One.

Considering the new evidence, the undersigned finds that Gould's conclusion that hippocampal findings did not correlate with a history of febrile seizures further supports the undersigned's previous finding. That is, Gould's conclusion that hippocampal findings did not correlate to a history of febrile seizures provides additional evidence weighing against Petitioners' theory that hippocampal abnormalities may cause children to be vulnerable and at risk of sudden death. The undersigned finds that this aspect of Petitioner's theory is not sound or reliable or supported by preponderant evidence.

Further, as noted in the prior Decision, Petitioners' experts extrapolated information from studies related to children with epilepsy (SUDEP) and applied it to children who did not have epilepsy or a history of prior seizures. These studies noted comparisons between SUDC and SUDEP, and questioned whether the pathophysiology which leads to fatal seizures in children with epilepsy may be relevant to unexplained deaths of children, although they did not reach any conclusions that are transferable to the facts and circumstances here. For example, Dr. Miller testified that the mechanism in SUDC is "similar or identical" to the hypothesis described in SUDEP. Anklam, 2023 WL 8890662, at *40; Tr. 68.

Gould discussed SUDEP in their introduction, stating that "[s]udden unexpected death in epilepsy (SUDEP) risk factors and possible mechanisms of death align with sudden deaths in children." Pet. Ex. 82 at 2. However, Gould did not reach any conclusions specific to sudden death in epilepsy. In concluding remarks, the authors specifically stated that "[t]he causes of the convulsive events in our cases are unknown; mild infections may have lowered the seizure or febrile seizure threshold." Id. at 7. While the authors posited that mild infections may have

[58] As explained in the initial Decision, and here again, whether N.A. had or did not have hippocampal abnormalities is not determinative of the undersigned's finding as to Althen prong one because there are other independent reasons for the undersigned's determination.

played a role, earlier in the paper, the authors stated that "six cases had postmortem evidence of infection with mild pathology not considered significant for primary cause of death." Id. at 5. These two statements are inapposite; on the one hand, the infection was not considered significant enough to play a role in the primary cause of death, and on the other hand, the authors suggest that mild infections may have lowered the seizure threshold. Regardless, Gould does not explain why the convulsions occurred.

In summary, the Gould findings weigh against a theory based on a pathophysiological basis (hippocampal anomalies/abnormalities) or history of febrile seizures and correlation with SUDC. Thus, the undersigned finds that Gould fails to support Petitioners' theory that hippocampal changes or febrile seizures (or seizures) in a child without epilepsy can lead to seizure-induced death. Anklam, 2023 WL 8890662, at *40-41.

Next, the undersigned finds Gould does not support the opinion of Dr. Shuman relative to how the MMRV vaccine can cause a seizure which can lead to death. He opined that vaccines "may predispose" children to have seizures by lowering the seizure threshold. Pet. Ex. 83 at 9. According to Dr. Shuman, the seizure threshold can be lowered due to sleep deprivation and fever. Gould did not address sleep deprivation as a cause for febrile seizures. Only one of the children had a history of fever in the 72-hour period before death, and that child's cause of death was "asphyxia due to obstructed airway" by enlarged tonsils and viral and bacterial infection (Case 2). Pet. Ex. 82 at 4 tbl. 2. This child's cause of death was attributed to asphyxia, and thus, she was not included in the group of six children with unexplained sudden death. Dr. Shuman did not offer any explanation of how Gould supported his statement that vaccines can predispose children to having seizures based on the newly filed evidence here.

Another opinion offered by Dr. Shuman is that Gould demonstrates that "brief seizures" cause death without the occurrence of prior seizures. Pet. Ex. 83 at 12. However, Dr. Shuman does not explain how the vaccinations at issue can cause brief seizures.

Dr. Shuman cited a commentary from Fine, which stated that the "key finding" in Gould was that "convulsive events preceded death in all cases." Pet. Ex. 87 at 3. However, Dr. Fine agreed that this did not suggest that "a seizure precedes every case of sudden death." Id. Moreover, Dr. Fine did not discuss how vaccinations played any role in sudden death of children.

The second commentary referenced by Dr. Shuman, by Goldstein and Poduri, raised a number of concerns about Gould, including the observation that although EEG monitoring was not performed, the Gould authors concluded that the videos showed convulsive activity. Goldstein and Poduri concluded that due to the small sample size in Gould, and the possibility of study bias, it was too early to determine whether the findings could be generalized.

Dr. Lidov questioned whether the seven children who were monitored reflected the demographics of the 248 children in the younger age group due to sample selection, age range accounting for physiologically differences, lack of definition of convulsive events, lack of verification of convulsive events with EEG monitoring, prior research showing the difficulty in accurately detecting seizures from abnormal movements due to other causes, and the range of timing of terminal convulsions suggesting lack of unified mechanism. Further, Dr. Lidov

explained that in order to put the Gould cases into context, background information about whether the same or similar abnormal movements are seen in sleeping children who do not die. Without this comparison, it is not known whether the abnormal movements occur as normal events during sleep. Because Dr. Lidov does not believe that seizures can be reliably recognized, he rejects the assumption underlying the Gould study, that six out of the seven videos show convulsive movements, that the cases represent the majority of SUDC cases, and that the movements are seizures that caused death.

Dr. Lidov's opinions were supported by subsequent commentaries about Gould expressing concern regarding methodology, the significance of the prone position in all of the children, and the concern that the recorded cases were not representative of the population of children with sudden unexplained death.

Moreover, regarding the underlying mechanism, Dr. Lidov explained that convulsions can occur due to cerebral anoxia, and that it is not possible to distinguish convulsions caused by seizure/epilepsy from those caused by cardiac-induced cerebral anoxia. Alternatively, Dr. Lidov opined that the Gould videos may reflect the dying process, "from whatever cause." Resp. Ex. AA at 3.

All three experts cited an editorial from Hegyi et al. that critiqued Gould, noting that because Gould did not compare the occurrence of seizures in SUDC cases with those in living children, it did not provide evidence for an increased risk of death after seizure. Additionally, due to the lack of EEG monitoring in Gould, seizures could not be confirmed. Hegyi et al. expressed concern about neurodevelopmental compromise in children in the Registry, other factors found at autopsy that could account for death, the conflation of SIDS and SUDC due to age range of children in the study, and the role of sleep and bedding. Dr. Lidov and Dr. McCusker also opined that it was difficult to diagnosis seizures based on videos.

Overall, the undersigned does not find Dr. Shuman's opinions as to Althen prong one to be supported by Gould or the medical literature he cited. The undersigned finds Dr. Lidov's and Dr. McCusker's critiques of Gould persuasive, and coupled with the commentaries in the medical literature, the undersigned agrees it is premature to conclude that the Gould study findings accurately represent the population of children who suffer sudden unexplained death at the age of one year. Dr. Lidov summarizes the findings of Gould best, stating, "if one accepts all of Gould's suppositions, irrespective of their weaknesses, the most one could say is that it is possible, not probable, that a proximate seizure could cause SUDC." Resp. Ex. AA at 6.

Lastly, the undersigned's finding is consistent with a prior vaccine case where a special master considered Gould in the context of a sudden unexplained death in a child, where the theory was similar to Petitioners theory here.[59] In Catone, the petitioners' expert asserted that Gould supported the petitioner's proposed medical theory that the child died due to a terminal seizure. Catone ex rel. N.C. v. Sec'y of Health & Hum. Servs., No. 19-690V, 2025 WL 2692275, at *29 (Fed. Cl. Spec. Mstr. Aug. 8, 2025). The special master noted that while Gould "observed convulsive events among seven cases otherwise determined to represent SUDC, the

[59] The undersigned notes that the facts and vaccination in Catone are dissimilar to those here.

authors acknowledged that hippocampal findings did not correlate with febrile seizure history, that [it] was a small study that lacked physiologic monitoring to distinguish abnormal movements, and importantly, that 'the cause of the convulsive events in [their] cases [was] unknown.'" Id. Thus, the special master found that Gould "explicitly stated that the cause of the convulsive events they observed remains unknown." Id.

In conclusion, after consideration of Gould, the expert reports, and the medical literature cited after reopening this matter, the undersigned finds Petitioners have failed to provide preponderant evidence of a sound and reliable theory to explain how the MMRV vaccine can cause a seizure in a vulnerable child which can lead to death.

### B. Althen Prong Two

Under Althen prong two, Petitioners must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." Capizzano, 440 F.3d at 1324 (quoting Althen, 418 F.3d at 1278). "Petitioner[s] must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" Pafford, 451 F.3d at 1356 (internal citations omitted).

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" (quoting Althen, 418 F.3d at 1280)). Medical records are generally viewed as trustworthy evidence, since they are created contemporaneously with the treatment of the vaccinee. Cucuras, 993 F.2d at 1528. Petitioners need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." Capizzano, 440 F.3d at 1325. Instead, Petitioners may satisfy their burden by presenting circumstantial evidence and reliable medical opinions. Id. at 1325-26.

As reflected in the initial Decision, Petitioners' experts opined that the MMRV vaccination administered to N.A. on June 23, led to a fever on June 30, that provoked a seizure that night, which caused N.A.'s death. The undersigned again finds Petitioners' have failed to establish preponderant evidence that N.A. had a seizure, and thus, the factual predicate for Althen prong two is lacking, and there is no logical sequence of cause and effect. Since Petitioners failed to prove the factual predicates underlying their theory, and failed to prove Althen prong one, it follows that they cannot prove Althen prong two.

In addition to the factual findings, the initial Decision discussed additional reasons for the finding on Althen prong two. These included the lack of support by N.A.'s treating physicians or pathologists (who conducted the autopsy or the SUDCRRC case review) because they did not attribute N.A.'s death to either a seizure or her vaccinations. Additionally, Petitioners' experts offered opinions based on statistics, which have been rejected as proof of causation. See Boatmon, 941 F.3d at 1362-63; at 1363 (explaining the Circuit has "previously rejected

statistical likelihood alone as proof of actual causation"); see also Knudsen, 35 F.3d at 550 (rejecting a theory based on a "bare statistical fact").

The new evidence considered herein regarding Althen prong two primarily consists of the expert opinions. Dr. Shuman opined that Gould "demonstrates that seizures precede and cause most SUDC deaths." Pet. Ex. 83 at 12. He reasoned that "[i]t is undeniable that [N.A.] had SUDC," and "[t]herefore, it is far more likely than not that [N.A.] had a seizure that caused her death the night that she died." Id.

There are several reasons Dr. Shuman's conclusion is erroneous. First, Dr. Shuman's opinion overstates the conclusions in Gould. The authors do state that the audio-visual monitoring in the seven cases of SUDC "strongly implicated convulsive seizures," but they did not say that seizures "precede and cause most SUDC deaths." Pet. Ex. 82 at 6. Instead, they wrote, "these recordings of sudden childhood deaths are a unique data set providing compelling evidence that terminal seizures may be much more common than medical histories suggest." Id. at 7.

Second, Gould concluded that "[t]he causes of the convulsive events in [their] cases [were] unknown." Pet. Ex. 82 at 7. Dr. Shuman mischaracterizes Gould by stating that Gould "demonstrates that seizures precede and cause most SUDC deaths." Pet. Ex. 83 at 12. Gould does not offer conclusions about the causes of the convulsions or cause of death; the final cause of death for six of the seven cases was "[u]nexplained sudden death." Pet. Ex. 82 at 4 tbl. 2. Dr. Shuman's suggestion that seizures cause most SUDC deaths based on Gould is inconsistent with the statement in Gould that the causes of the convulsive events were unknown. This inconsistency renders Dr. Shuman's opinion on this point less persuasive.

Special masters must consider the credibility of expert witnesses. Porter v. Sec'y of Health & Hum. Servs., 663 F.3d 1242, 1250 (Fed. Cir. 2011). Experts who mischaracterize and misstate medical literature "profoundly undermine [their] credibility." Prokopeas v. Sec'y of Health & Hum. Servs., No. 04-1717V, 2019 WL 2509626, at *19 (Fed. Cl. Spec. Mstr. May 24, 2019); see also Orm v. Sec'y of Health & Hum. Servs., No. 14-257V, 2023 WL 2984794, at *31-32 (Fed. Cl. Spec. Mstr. Apr. 18, 2023); Burgess v. Sec'y of Health & Hum. Servs., No. 17-688V, 2022 WL 17410582, at *30-31 (Fed. Cl. Spec. Mstr. Nov. 7, 2022); Rogero v. Sec'y of Health & Hum. Servs., No. 11-770V, 2017 WL 4277580, at *49-50 (Fed. Cl. Spec. Mstr. Sept. 1, 2017), aff'd, 748 F. App'x 996 (Fed. Cir. 2018).

Next, the limitations of Gould were acknowledged: there was a small sample size, lack of monitoring to distinguish abnormal movements from seizures, variable quality of monitoring, limited duration of monitoring, and case selection may have been biased ("possibly not representative of the [] SUDC population"). Pet. Ex. 82 at 7. These limitations, the subsequent editorials/commentaries expressing concerns regarding Gould, and the lack of studies replicating the findings weigh against Dr. Shuman's extrapolation of the findings in Gould.

"An expert may 'extrapolate from existing data,' and use 'circumstantial evidence,' [b]ut the reasons for the extrapolation should be transparent and persuasive." K.O. v. Sec'y of Health & Hum. Servs., No. 13-472V, 2016 WL 7634491, at *12 (Fed. Cl. Spec. Mstr. July 7, 2016)

(internal citations omitted) (first quoting Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. 706, 743 (2009); and then quoting Althen, 418 F.3d at 1280).

Further, Dr. Shuman presumes that the case of N.A.'s death was unexplained, however, Dr. Virani, the Forensic Pathologist who performed the autopsy opined that N.A. died of asphyxia with findings include pulmonary edema and blanching on the face. Pet. Ex. 6 at 1-2. N.A.'s records and autopsy results were later review by SUDCRRC, and after review issued a report stating N.A.'s cause of death was an unexplained sudden death, with intrinsic factors that she was febrile and had "evidence of immune activation," with extrinsic factors to include that she was "found prone with face down with blanching." Pet. Ex. 77 at 8-10. The manner of death was undetermined. Thus, although the SUDCRRC group stated that N.A.'s cause of death was unexplained, the examining Forensic Pathologist opined death was due to asphyxia. Dr. Shuman's presumption does not take this evidence into account.

Lastly, Dr. Shuman's opinions as to Althen prong two are conclusory. He concluded that "[t]he Gould article proves that [N.A.] had a seizure the night she died." Pet. Ex. 83 at 12. He asserted that the Gould findings are "consistent with the findings of [N.A.]," who "fits the profile, situation, and environment in which the Gould SUDCs were proven on video to die with a seizure and its cardiac and respiratory failures in the aftermath." Id. Without acknowledging the differences between the facts and circumstances in the Gould cases and N.A. individually or collectively, or explaining why these differences do not matter, Dr. Shuman reaches a sweeping conclusion that seizures caused N.A. death.

When evaluating whether petitioners have carried their burden of proof, special masters consistently reject "conclusory expert statements that are not themselves backed up with reliable scientific support." Kreizenbeck v. Sec'y of Health & Hum. Servs., No. 08-209V, 2018 WL 3679843, at *31 (Fed. Cl. Spec. Mstr. June 22, 2018), mot. for rev. denied, 141 Fed. Cl. 138 (2018), aff'd, 945 F.3d 1362 (Fed. Cir. 2020). The undersigned will not rely on "opinion evidence that is connected to existing data only by the ipse dixit of the expert." Prokopeas, 2019 WL 2509626, at *19 (quoting Moberly, 592 F.3d at 1315). Instead, special masters are expected to carefully scrutinize the reliability of each expert report submitted. See id.

In comparison, Dr. Lidov carefully articulates the differences between N.A. and the children in the Gould study. Petitioners assert that N.A. had a febrile seizure, and only two children in Gould may have had fever and/or a febrile seizure. N.A.'s bedroom had a monitor, but there is no evidence that N.A. had agonal movements or abnormal sounds. N.A. was younger than the children in Gould which raises the question of whether there were pathophysiological distinctions due to age. And lastly, three of the children had hippocampal changes and the undersigned found that N.A. did not have any such abnormality. Given the factual dissimilarities, Dr. Lidov persuasively opined that the findings in Gould may be inapplicable to N.A.

Like Dr. Lidov, Dr. McCusker had concerns about the findings and limitations of Gould. She questioned whether the cause of death in at least one of the cases could have been due to hypoxia/hypercarbia. Dr. McCusker opined that N.A. was "found prone and face down with feet though the slats of the crib, which may have impeded her ability to turn over in deep sleep,

leading to hypoxia/hypercarbia." Resp. Ex. Z at 4. Further, Dr. McCusker opined that Gould was not relevant to N.A.'s cause of death.

The undersigned finds that Respondent's expert opinions were more persuasive because their opinions accurately reflected the facts set forth in the medical records and reports central to the question of causation. Dr. Lidov identified specific reasons why the facts of the Gould cases were different that the facts and circumstances presented by this record and explained why these facts did not allow for extrapolation of the Gould findings to N.A.

For all these reasons, the undersigned finds that after consideration of Gould and the new evidence, Petitioners have failed to provide preponderant evidence of a logical sequence of cause and effect to satisfy their burden under Althen prong two.

## VI. CONCLUSION

The undersigned again extends her sympathy to Petitioners for their terrible loss. The undersigned's Decision, however, cannot be decided based upon sympathy, but rather on the evidence and law.

For the reasons discussed above, the undersigned finds, after reopening the case and consideration of Gould, the expert reports, and other new evidence, Petitioners have failed to establish by preponderant evidence that N.A.'s MMRV vaccination caused her death. Therefore, Petitioners are not entitled to compensation and the petition must be dismissed.

In the absence of a timely filed motion for review pursuant to Vaccine Rule 23, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this Decision. Pursuant to Vaccine Rule 28.1(a), the Clerk shall also promptly provide this Decision to the assigned judge.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master